STATE OF NEBRASKA, APPELLEE, V. DANIEL G. SUTTON,
APPELLANT.
434 N.W.2d 689

Filed January 27, 1989. No. 87-1071.

Edward F. Fogarty, of Fogarty, Lund & Gross, for appellant.

Robert M. Spire, Attorney General, and Donald E. Hyde for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

This is an appeal from the district court for Sarpy County. The defendant-appellant, Daniel G. Sutton, was charged by information with attempted first degree sexual assault (count I), second degree assault (count II), and possession of cocaine with intent to deliver (count III). He pled not guilty, and the matter was tried before a jury on September 14 to 16, 1987. The jury returned verdicts of guilty on all counts, and the defendant's motion for new trial was overruled. Defendant was sentenced to a term of 2 to 5 years' imprisonment on count I and 2 years' imprisonment on count II, with these sentences to run concurrently. He was sentenced to 3 to 10 years'

imprisonment on count III, to be served consecutively to the sentences imposed on counts I and II.

Defendant appeals, contending the district court erred (1) in admitting into evidence items seized at defendant's home and in failing to grant his motion to suppress said evidence; (2) in its rulings on evidentiary questions concerning defendant's prior use of cocaine, expert testimony regarding the amount of cocaine a user would possess for personal use, and cross-examination of the complaining witnesses on their knowledge of penalties for possession of cocaine; (3) in refusing to permit defendant to testify in surrebuttal regarding prior sales of cocaine to one of the State's complaining witnesses; (4) in its rulings on character evidence; (5) in failing to instruct the jury on self-defense in connection with count II; (6) in failing to instruct the jury on accomplice testimony with respect to count III; and (7) in failing to submit to the jury the lesser-included offenses to attempted first degree sexual assault.

Defendant further contends the district court was biased "towards the prosecution side," and abused its discretion and "prevented [him] from having a fair trial and a fair sentence and a fair disposition of the issues brought to the Court's attention" by (1) making derogatory comments on defendant's credibility at the suppression hearing; (2) allowing the jury to infer that defendant had attempted to tape-record the court proceedings; (3) failing to grant defendant's request to impanel a second black juror; (4) interrupting defendant's testimony so as to put him in a "bad light" before the jury; and (5) not admitting defendant to bail pending presentence investigation and failing to set an appeal bond.

Finally, defendant claims he received an excessive sentence. We affirm defendant's convictions and sentences on counts II and III, and reverse and remand for a new trial on count I.

The record shows the following facts supporting defendant's convictions. On the evening of May 2, 1987, the victim, Suzanne Gibson, and her friend Kristie Beener attended Beener's niece's wedding. After the wedding, the two women attended the reception. Defendant also attended the reception, together with his wife, Valeria; his small son; and his cousin, Nate Lawler. Although Gibson had not met defendant prior to

May 2, 1987, Beener and the defendant were social friends and had worked together at the Omaha Country Club. Beener testified that defendant suggested she and her friends come over to his house following the reception.

At 12:30 a.m., Gibson left the reception with Beener and another woman friend, taking with them a keg of beer left over from the wedding reception. They went to Gibson's home in Omaha, where they continued drinking. Sometime later, Beener telephoned defendant from Gibson's house "to see if he still had people out there."

At about 1:15 a.m., Beener and Gibson drove to the defendant's home. They arrived at 1:45 a.m. and went directly to the basement area of the house. Lawler carried the keg of beer to the basement. For the first half hour after their arrival, Gibson and Beener talked with several people in the basement, including the defendant, Valeria Sutton, Lawler, a female friend of Valeria's, and two small children. Defendant was no longer wearing the suit he wore to the reception, but was wearing pajamas and a robe.

At about 2:30 or 3 a.m., Gibson, Beener, Lawler, and the defendant began to play poker. During the card game, these parties continued to drink beer and started snorting cocaine. The cocaine was on a dinner plate which had been placed on the card table. Gibson testified that she first noticed the cocaine during the poker game and that there was about one-third of a cup of the substance on the plate. Beener testified that the plate of cocaine was not on the table when she and Gibson arrived, and estimated the amount of cocaine on the dinner plate to be about "half a gram." Both Gibson and Beener testified that the defendant set the cocaine up in lines at the table and that all the parties to the card game snorted it through straws or rolled-up dollar bills.

Gibson further testified that during the card game, defendant put his hand on her leg, under her dress at midthigh, and that she told him to stop. Beener testified that "we all kind of laughed it off. I said, 'She's a newly-married woman,' and I said, 'Dan,' I said, 'your wife and kid are upstairs.' "

The poker game ended at 6 a.m., when Beener and Lawler left to buy cigarettes. Gibson was ready to leave at this point,

but agreed to wait until Beener and Lawler returned. Shortly after Beener and Lawler left the house, defendant again tried to put his hand on Gibson's thigh. Gibson objected and stood up. Defendant pulled the front of Gibson's dress down, ripping the back loose and exposing her breasts. Gibson testified that as she tried to leave the room, the defendant struck her on the back of the head with a hard object, and she dropped to the floor. Defendant leaped on top of her from behind and hit her several times with the hard object, which Gibson later determined to be a gun when she observed it during the struggle. An exchange of biting took place, and Gibson saw blood dripping down her arms. Gibson testified that defendant "just kept telling me to do what he said so that he didn't have to shoot me." During the assault, defendant pulled Gibson's panty hose and panties to her knees and told her he was going to "stick his dick in [her] butt."

Gibson testified she did not remember how she got out of the basement. She left defendant's house and sought help from neighbors. Lynn Gawerecki, who did not know Gibson on the date of the assault, testified that Gibson rang her doorbell at about 7 a.m. and "had blood covering down her face and her arms and her hand." Gibson, who appeared to be "really scared" and "hysterical," told Gawerecki that defendant beat her and that he had a gun, and asked her to call the police. Gawerecki called the Sarpy County sheriff's office.

Meanwhile, Beener and Lawler returned to the Sutton home. Valeria Sutton answered the door and asked Beener, "Where's that girl? Dan's got blood on him." Beener went to the basement and saw that there were cards all over the floor. She left the house to look for Gibson, and eventually joined Gibson at the Gawereckis'.

Beener spoke with Gibson shortly after Gibson showered at Gawereckis' house. Beener testified that Gibson appeared to be in control until Beener entered the bathroom. At that time, Gibson became "hysterical" and began crying. Gibson told Beener that she had been attacked immediately after Beener and Lawler left the house and that defendant hit her with a gun and tried to sexually assault her.

Deputy Sarpy County Sheriff Larry Strazdas testified that he

was dispatched to the Gawerecki residence to investigate Gibson's complaint. By the time Deputy Strazdas arrived, Gibson had taken a shower, but she was bleeding from the top of her head and by her right ear, and her hair was "matted." Cpl. John Kucer, who had also been dispatched to the Gawerecki home, observed a cut on the back of Gibson's head, bite marks on her arm, bruising on her jaw, and a laceration close to the ear. The officers talked to Gibson at the Gawerecki residence for approximately half an hour, and Gibson's father took her to Midlands Hospital for treatment.

Corporal Kucer and Deputy Strazdas arrived at the defendant's residence at approximately 7:30 a.m. to question the defendant. Deputy Strazdas testified at trial that when he knocked on the front door of the defendant's house, a man answered. This man identified himself as defendant's "brother," Nate Lawler, and invited Strazdas and Kucer to enter. The officers stayed in the entryway while Lawler went to get the defendant. A few minutes later, defendant came from the bedroom area to the entryway, sat down on the steps facing the front door, and gave the officers his driver's license for identification. He was wearing blue jeans and a dark T-shirt. Defendant did not appear to be disoriented or intoxicated, although Corporal Kucer noticed a smell of alcohol coming from the defendant.

Deputy Strazdas then told defendant he had come from the neighbor's house, where a female had reported that defendant hit her in the head with a gun and attempted to assault her sexually. Defendant denied Gibson's version of events, stating that when Gibson left his basement she tripped and fell and bumped her head, and that he went to bed after Gibson ran out the door. Defendant further stated that he did not own a gun and that the officers "could look around" if they wanted to. Valeria Sutton also appeared at the entryway during this discussion and stated to the officers that defendant did not own a gun and they could look around if they wanted to.

Corporal Kucer and Deputy Joseph Eaton made a cursory search of the basement at that time. Corporal Kucer noticed smudges of blood on a wall leading to the basement, but discovered no blood on the steps. The officers were in the

basement for 5 to 10 minutes and did not find a gun, but seized a film canister and two straws from the basement. Kucer told the other officers to search around the outside of the house to make sure the weapon had not been deposited outside.

Deputy Strazdas searched the kitchen area for a gun while the other two officers were in the basement. When Kucer and Eaton came back upstairs, Strazdas placed the defendant under arrest and handcuffed him. Corporal Kucer took defendant to the Sarpy County sheriff's office.

Deputies Strazdas and Eaton stayed at the house and continued searching for a gun. Valeria Sutton was present in the kitchen when Strazdas went out a sliding glass door onto the deck or porch area of the house. He noticed a stack of bags containing "top soil or fertilizer or whatever" under the deck. After Strazdas moved some of the bags, he discovered an opened bag of charcoal briquettes. He looked in the bag of charcoal and found a purse. Strazdas opened the purse and found a "big wad of money" and "two white squares of some type of a substance in a little plastic bag." Valeria Sutton then came out onto the deck and asked Strazdas what he was doing with her purse. Strazdas held the purse pending the arrival of Investigator Kenneth Benck from the sheriff's office.

Deputy Strazdas met Investigator Benck outside when he arrived at the defendant's house. Strazdas gave the purse to Benck and informed him that the incident involved a gun that was used to strike Gibson and that they were looking for the gun. Strazdas further informed Benck that they had performed a cursory search of the house, and, in order to do a more complete search, he wanted a consent-to-search form signed. Benck then entered the residence and explained the form to Mrs. Sutton. At approximately 9:04 a.m., Valeria Sutton signed the consent-to-search form, which states in part:

> I do hereby authorize representative(s) of the Sarpy County Sheriff's Department to search my residence (or other real estate) located at 14812 Edna St and/or my motor vehicle(s) (Namely) [all vehicles] presently parked or located at 14812 Edna St.
>
> I am giving this written permission to these Sheriff's Deputies, freely and voluntarily, without any threats or

promises having been made to me.

Benck was inventorying Valeria Sutton's purse when Corporal Kucer returned to the residence. Kucer observed that the purse contained "a great deal of money" loose, "balled up," and in small bills. The purse contained $3,032.25 in cash. The "two white squares of some substance" observed by Deputy Strazdas when he found the purse were subsequently determined to be 19 grams of pure cocaine.

After Valeria Sutton signed the consent-to-search form, Deputies Strazdas, Eaton, Kucer, and Benck conducted a thorough search for a handgun, searching "[a]ny area that would afford a size large enough to conceal a handgun."

The officers never found a gun in the Sutton residence. Investigator Benck, however, seized a black shoulder holster from the hall closet, and Deputy Eaton found some marijuana in one of the rooms. Corporal Kucer, searching the fireplace in the living room area, discovered a set of defendant's underwear hidden in the hearth. When Kucer opened up the flue, he found the pajamas the defendant wore during the poker game. The pajamas were wet with blood.

Defendant admitted at trial that there was marijuana and $3,000 cash (which he described as an emergency fund) in his house, but claimed he did not know where the cocaine came from and denied putting it in his wife's purse. He stated that after Beener and Lawler left to get cigarettes, Gibson asked to use the restroom, grabbed her purse, took a few steps, staggered, tripped over the beer keg, and fell down. Defendant testified that when he tried to help Gibson get up, she "started acting crazy," and the two engaged in a struggle. Defendant further testified that after Gibson ran away, defendant told his wife to put the money in a safe place. He admitted that there was indeed blood all over the basement when Gibson left and that he had hidden his clothing in the fireplace.

Defendant testified during direct examination that he had been convicted in Detroit, Michigan, in January 1978, of carrying a concealed weapon. He testified on cross-examination that he used cocaine "through the Seventies and Eighties" and had been treated for drug and alcohol use in 1983.

Defendant first claims the district court erred in admitting into evidence the items seized at defendant's home and in failing to grant his motion to suppress said evidence. When evidence is seized pursuant to consent, and not pursuant to a warrant, the burden is on the government to prove that the search was voluntarily permitted, invited, or agreed to by the persons whose rights were involved. *State v. French*, 203 Neb. 435, 279 N.W.2d 116 (1979). Whether a person voluntarily consented to a search is a question of fact to be determined from the totality of circumstances surrounding the search. *State v. French, supra*.

At the suppression hearing, defendant denied that he had authorized a search of his residence. Deputies Strazdas and Kucer testified at the suppression hearing that both the defendant and his wife denied having a gun in the house and said that the officers could look for a gun if they wanted to. Neither the defendant nor his wife was under arrest when these statements were volunteered. The only conversation the deputies could recall concerning a search warrant of the premises was with Lawler, a houseguest. Neither the defendant nor his wife revoked or limited the consent to search after consent was given.

At a hearing to suppress evidence, the court, as the trier of fact, is the sole judge of the credibility of witnesses and the weight to be given to their testimony and other evidence. In reviewing a court's ruling as the result of a suppression hearing, the Supreme Court will not reweigh or resolve conflicts in the evidence, but will uphold the trial court's findings of fact unless those findings are clearly wrong. *State v. Marco*, 230 Neb. 355, 432 N.W.2d 1 (1988); *State v. Vann*, 230 Neb. 601, 432 N.W.2d 810 (1988). Here, the trial court resolved the conflicts in evidence in favor of the State and found that defendant did give the deputies permission to search the premises for a gun and that his authorization was volunteered and not coerced. That finding is not clearly wrong.

Defendant cites *State v. Billups*, 118 Ariz. 124, 575 P.2d 323 (1978), and *State v. Pinder*, 126 N.H. 220, 489 A.2d 653 (1985), in support of his claim that the scope of the consent given, if any, was for the house only, and the 19 grams of cocaine should

have been suppressed because it was found underneath the back patio deck. Defendant correctly states that a search made pursuant to consent may not exceed the scope of the consent. *State v. Pinder, supra*; 3 W. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 8.1(c) (2d ed. 1987).

The *Pinder* and *Billups* decisions are not factually similar to the present case. They hold that the scope of consent to search a "house" could not reasonably be construed to authorize a search of locked outbuildings. Even on that point, there is authority to the contrary. See, *Commonwealth v. Eckert*, 244 Pa. Super. 424, 368 A.2d 794 (1976); *Drummond v. United States*, 350 F.2d 983 (8th Cir. 1965). See, also, *State v. Trahan*, 229 Neb. 683, 687, 428 N.W.2d 619, 622 (1988), where we said, " ' "Curtilage is usually defined as a small piece of land, not necessarily enclosed, around a dwelling house and generally includes buildings used for domestic purposes in the conduct of family affairs." ' "

The defendant and his wife both claimed there was no gun in the house and gave oral permission for the investigating officers to search their residence for a gun. The purse containing over $3,000 in cash and 19 grams of cocaine was discovered under the back deck of the house, concealed in a bag of charcoal found leaning against the foundation of the house. Since the evidence was discovered within the curtilage of the home in an area that could be described as part of the house, and in a place where a gun could be hidden, it was seized pursuant to the terms of defendant's and Valeria Sutton's oral consent to search. The findings of the trial court to this effect are not clearly wrong, and defendant's first assignment of error is without merit.

Defendant next claims he was unfairly prejudiced at trial as a result of certain rulings pertaining to evidence of his prior acts. The record shows that Beener was allowed to testify during the State's case in chief that she had used cocaine with the defendant "a couple times" in the past. The trial court sustained defendant's objection to Beener's testimony during the State's case in chief that she purchased cocaine from the defendant on previous occasions.

Defendant chose to testify on his own behalf. He testified during his direct examination that he knew there was $3,000 in

cash in his wife's purse on his dresser, but that he had not acquired any portion of the $3,000 emergency fund from selling cocaine. He further testified that he was not running a cocaine business from his house. He denied during direct examination that he ingested cocaine on the night in question, but admitted he smoked marijuana that night. He further testified that he had no kits or packets containing razors or mirrors that would allow him to use and separate cocaine "for either use or to sell." The defendant clearly testified on his direct examination on the subject of his personal use of cocaine.

During cross-examination, the prosecutor asked defendant, "I take it from what you're saying that you've never used cocaine?" Defense counsel objected on grounds of relevancy and that the State was attempting to elicit evidence of specific events. The objection was overruled for the reason that the question did not relate to specific acts. The prosecutor then asked, "Have you ever used cocaine?" to which defendant replied, "Sure have." Defense counsel objected again, on the same grounds, and the objection was overruled. Without a question pending, defendant volunteered the following information: "Well, I've used cocaine through the Seventies and Eighties, some parts of the early Eighties." There was no objection to or motion to strike this volunteered testimony. The line of questioning was pursued, and defendant testified he began using cocaine and other drugs when he was in Vietnam in 1968, that he began participating in a drug treatment program in May 1983, and that he had not used cocaine since that time. After eight similar questions, defense counsel then objected to the line of questioning and moved to strike the testimony about defendant's prior cocaine use. The objection was overruled because it was not timely. Defendant's delay in objecting could be a possible trial tactic in establishing that defendant was a Vietnam veteran who had become dependent on cocaine while in the service of his country. Defendant then testified, over objection, that he had never sold cocaine.

Beener was then called as a rebuttal witness and testified she had purchased cocaine from the defendant at his home four or five times in the past. The trial judge did not allow defendant to testify again in surrebuttal that he had never sold cocaine.

Defendant claims, in his brief at 24, that Beener's testimony that she had used cocaine with him in the past was improperly introduced "to prove that he used or he sold cocaine on the night in question because he had used it before," in violation of Neb. Evid. R. 404(1) (Neb. Rev. Stat. § 27-404(1) (Reissue 1985)), which provides, in part: "Evidence of a person's character or a trait of his or her character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion . . . ." Defendant further claims the State's cross-examination of him regarding prior sales and use of cocaine also was improper under rule 404(1) and was outside the scope of his direct examination, thus making Beener's rebuttal testimony improper.

In *State v. Thaden*, 210 Neb. 622, 627, 316 N.W.2d 317, 321 (1982), we noted that " 'cross-examination is proper as to anything tending to affect the accuracy, veracity, or credibility of the witness' and 'anything within the knowledge of a witness tending to rebut evidence given on direct examination is admissible as a matter of right on cross-examination.' " The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion. *State v. Moore*, 221 Neb. 706, 380 N.W.2d 288 (1986); *State v. Thaden, supra.*

We conclude the trial court did not abuse its discretion in allowing the prosecutor to cross-examine defendant regarding prior sales and use of cocaine. During his direct testimony, defendant specifically denied he had received any portion of the $3,000 from selling cocaine or that he was running a cocaine business from his house. Defendant further denied using cocaine on the night in question and denied that he possessed paraphernalia that would allow him to use or sell cocaine. He stated that he did not put the 19 grams of cocaine in his wife's purse and had not seen the cocaine prior to trial. The subjects of whether defendant used cocaine and sold cocaine were within the scope of his direct examination, and were proper subjects for impeachment or rebuttal.

During cross-examination, defendant volunteered the statement that he had used cocaine "through the Seventies and Eighties" and testified that he had participated in a treatment

program for drug and alcohol use. There was no timely objection or motion to strike this testimony, and the trial court did not abuse its discretion in overruling defendant's untimely objection and motion to strike. Defendant verified on redirect that he "went through some sort of drug treatment program in Detroit."

Although the trial court erred in allowing Beener to testify during the State's case in chief that she had used cocaine with the defendant in the past, see *State v. Friend*, 230 Neb. 765, 433 N.W.2d 512 (1988), Beener's testimony on this point is merely cumulative to the defendant's own testimony, which was properly admitted. As such, the error is harmless beyond a reasonable doubt and is not grounds for reversal. See *Friend, supra.*

It is within the trial court's discretion to admit or exclude evidence, and such rulings will be upheld on appeal absent an abuse of discretion. *State v. Methe*, 228 Neb. 468, 422 N.W.2d 803 (1988); *State v. Lenz*, 227 Neb. 692, 419 N.W.2d 670 (1988). The trial court did not abuse its discretion in refusing to allow defendant to repeat his own testimony in surrebuttal that he never sold cocaine.

Defendant further contends the trial court erred in allowing Sarpy County Deputy Sheriff Steve Grabowski, a former narcotics investigator, to testify, based on his years of experience in the field, that he was of the opinion 19 grams of pure cocaine was more than one would possess for one's personal use. Aside from the fact that defendant's objection to Deputy Grabowski's opinion testimony was not timely, the record indicates that Grabowski was properly qualified to testify as an expert on this subject. See *State v. Hoxworth*, 218 Neb. 647, 358 N.W.2d 208 (1984). Defendant's assertion to the contrary is without merit.

Defendant also complains he was improperly prevented from cross-examining Gibson and Beener during their rebuttal testimony as to "whether they recognized that it was much more serious to be involved in delivering cocaine than using it." Brief for appellant at 28. The extent of Gibson's rebuttal testimony was that she had taken a gray, not white, purse to the defendant's house; that there was no gun in the purse and that

neither she nor her husband owned a handgun; and that she did not recall seeing one of defendant's witnesses in the basement on the night of May 2. Beener testified during her rebuttal testimony as to her working relationship with the defendant at the Omaha Country Club; that she had purchased cocaine from the defendant on previous occasions; that Gibson had carried a gray or dark-pink purse to defendant's house; and that Beener had never known Gibson to carry a gun. Even if defendant's attempted cross-examination of Gibson and Beener on the subject of their knowledge of the penalties for using and delivering cocaine was relevant, it was outside the scope of the witnesses' rebuttal testimony, and the trial court did not abuse its discretion in sustaining the State's objection to this line of questioning.

Defendant's last assignment of error involving evidentiary rulings is that the trial court erred in interfering with his "character defense on his character trait of being polite and appropriate with women." Brief for appellant at 28. During the examination of the first of seven character witnesses, the court held a hearing outside the presence of the jury to determine the State's foundational objection to the witness' opinion that defendant had a character trait of "chivalrousness or decent conduct around women and with females." The trial court sustained the objection and ruled that it would require foundational evidence that the character witnesses had observed defendant under circumstances as they existed on the night of May 2, 1987, before it would allow the witnesses to testify to more than defendant's general character. Defendant was allowed to present seven character witnesses, six of whom worked with him at Fireman's Fund Insurance Company in Omaha. All seven witnesses testified generally that defendant was of good character, but none had observed defendant in the social environment present in his basement on the night the offenses occurred. The trial court's evidentiary ruling on this point was not clearly wrong, and the defendant's assignment of error is without merit.

Defendant's next three assignments of error pertain to jury "requested" instructions. With regard to count I (attempted sexual assault in the first degree), defendant claims the trial

court erred in failing to submit to the jury the lesser-included offenses to attempted first degree sexual assault. The State has referred us to *State v. Swoopes*, 223 Neb. 914, 395 N.W.2d 500 (1986), which holds that there are no lesser-included offenses to attempted first degree sexual assault. That decision was overruled in *State v. Jackson*, 225 Neb. 843, 408 N.W.2d 720 (1987), cited by neither the State nor the defendant. In *Jackson*, we held that

> a substantial step in a course of conduct intended to culminate in a sexual assault in the first degree (sexual penetration) may include a substantial step in a course of conduct intended to culminate in achievement of sexual contact as well, that is, commission of a sexual assault in the second degree. Consequently, within the offense of "criminal attempt," § 28-201, an attempt to commit a particular crime may also include an attempt to commit a lesser-included offense in reference to the designated crime alleged to have been attempted.

*Jackson, supra* at 856, 408 N.W.2d at 729-30. In light of our decision in *Jackson*, and the facts of this case, we determine that the trial court erred in failing to instruct the jury on the lesser-included offenses of attempted sexual assault in the second degree and third degree. We therefore reverse defendant's conviction on count I and remand the cause for a new trial.

Defendant next claims the trial court erred in failing to instruct the jury on self-defense in connection with count II, second degree assault. Neb. Rev. Stat. § 28-1409(1) (Reissue 1985) provides:

> Subject to the provisions of this section . . . the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

The record is devoid of evidence that Gibson used unlawful force against the defendant. In addition to Gibson's testimony that defendant assaulted her, defendant himself testified that at first he thought Gibson had overdosed, was unconscious, or

had "lost her mind" when she began to struggle against him. He also described Gibson as "delirious" and testified that he hit her over the head with his fist because she was fighting him. The trial court is not required to give a jury instruction where there is insufficient evidence to prove the facts claimed, *State v. Moreno*, 228 Neb. 210, 422 N.W.2d 56 (1988), and the trial court did not err in failing to instruct the jury on self-defense.

Defendant also contends that the trial court erred in denying his request that the jury be given a cautionary instruction as to the weight and credibility of the testimony of accomplices.

> "To constitute one an accomplice he must take some part in the crime, perform some act, or owe some duty to the person in danger that makes it incumbent on him to prevent the commission of the crime. Mere presence, acquiescence, or silence, in the absence of a duty to act, is not enough, however reprehensible it may be, to constitute one an accomplice. The knowledge that a crime is being or is about to be committed cannot be said to constitute one an accomplice . . . ."

*Wilson v. State*, 170 Neb. 494, 509-10, 103 N.W.2d 258, 269 (1960), *cert. denied* 364 U.S. 887, 81 S. Ct. 178, 5 L. Ed. 2d 108. See, also, *State v. Morrow*, 220 Neb. 247, 369 N.W.2d 89 (1985). The record does not support defendant's claim that Beener and Gibson were his "accomplices" with respect to count III, possession of cocaine with intent to deliver. The court did not err in refusing defendant's requested instruction regarding accomplice testimony.

Defendant next alleges he was prevented from having a fair trial and sentencing due to the cumulative effect of the trial court's abuses of discretion in pretrial matters, during trial, and after trial. He first claims the court owed him a "gesture towards fairness" and should have manipulated the jury selection procedure to allow a second black juror to be impaneled. Brief for appellant at 37. The State exercised only three of its peremptory challenges during voir dire. The court excused all jurors not challenged in the reverse order in which they had been called. The record does not show, nor does the defendant claim, that the selection of jurors was racially motivated. See *State v. Threet*, 225 Neb. 682, 407 N.W.2d 766

(1987). The trial court did not abuse its discretion in the jury selection process. Defendant's other claims that the trial court abused its discretion in conducting pretrial hearings, the trial itself, and the sentencing hearing are equally without merit.

Defendant claims as his final assignment of error that he received an excessive sentence and should have been sentenced to probation. A sentence imposed within the limits prescribed by statute will not be set aside as excessive absent an abuse of discretion on the part of the sentencing judge. *State v. Jones,* 230 Neb. 528, 432 N.W.2d 523 (1988). Similarly, granting probation, as opposed to imposing a sentence of incarceration, is a matter left to the discretion of the trial court, and a denial of probation will not be disturbed on appeal absent an abuse of discretion. *State v. Fletcher,* 221 Neb. 562, 378 N.W.2d 859 (1985).

We have reversed defendant's conviction for attempted first degree sexual assault. Second degree assault is a Class IV felony, punishable by a maximum of 5 years' imprisonment, a $10,000 fine, or both; defendant was sentenced to 2 years' imprisonment. Possession of cocaine with intent to deliver is a Class II felony, punishable by imprisonment for not less than 1 nor more than 50 years; defendant was sentenced to 3 to 10 years. The sentences imposed are well within the statutory limits, and we find no abuse of discretion in the sentences imposed in connection with counts II and III.

The judgment of the district court is affirmed with respect to counts II and III. We reverse defendant's conviction on count I and remand for a new trial on that count.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR A NEW TRIAL.