STATE OF NEBRASKA, APPELLEE, V. EDWIN KIMMINAU, APPELLANT.

481 N.W.2d 183

Filed March 6, 1992.   No. S-90-923.

Arthur R. Langvardt for appellant.

Don Stenberg, Attorney General, and James A. Elworth for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

After a trial to the court the defendant, Edwin Kimminau, was found guilty of possession of cocaine and sentenced to 24 months' probation. He has appealed, and his assignments of error, when summarized, allege that (1) the trial court erred in failing to suppress evidence which became the basis for the defendant's conviction and that (2) to the extent the trial court's verdict rested on certain evidence, i.e., evidence contained within a cooler, the judgment is not supported by the evidence.

The record shows that about 3:30 a.m. on May 28, 1989, Harlan County Deputy Sheriff Donald Tompkins spotted a pickup truck in a field near the Harlan County Dam and Lake. The lights of the pickup then came on, and the pickup left the field, turned onto an unpaved road, and drove past Deputy Tompkins' patrol vehicle. Officer Tompkins followed the pickup for a "quarter to half mile" and observed the pickup weaving, with the pickup's right tires occasionally driving onto the gravel road's grass shoulder.

Suspecting that the pickup's driver was intoxicated, Deputy Tompkins stopped the vehicle and requested identification

from the driver, Brent Jullian. When Jullian could produce no identification, Tompkins asked him to step out of the vehicle. When Jullian complied with this request, Tompkins noticed a number of "stray bullets" lying on the seat of the pickup next to two passengers, who had been riding with Jullian. Being concerned for his own safety, Tompkins requested the two male passengers to get out of the pickup and directed all three men to place their hands on the hood of the pickup. Tompkins commenced pat-down searches of the men to determine whether any of them were armed. Tompkins began with Daniel Calderon, one of the passengers in the pickup.

Although it was late May, Calderon was wearing a "very thick heavy winter type coat," which made it difficult for Tompkins to determine whether Calderon was carrying a weapon. While conducting his pat-down search, Tompkins felt a bulky object which he thought might be a gun in Calderon's coat. Tompkins removed the object, which turned out to be a clear plastic bag filled with a substance which Tompkins suspected to be cocaine. Tompkins then informed the three men that they were under arrest and directed them back to his patrol vehicle. Before he could handcuff each of the men, one of the three fled into a field. Tompkins radioed for assistance, and law enforcement officers later searched the area, but they were unable to locate the escapee.

Tompkins described the escapee as being 5 feet 10 inches to 6 feet tall, weighing 175 pounds or more, and wearing red sweat pants. While the defendant had a beard at the time of his arrest, Tompkins testified that the escapee had no beard.

After arresting the two men, Tompkins recovered a firearm from the pickup and found that the pickup also contained ammunition which did not match the weapon which was recovered. Thus, the officers believed it likely that the escapee could be armed.

Harlan County Sheriff Ron Early briefly questioned Calderon and Jullian after their arrest. Early also observed "track marks" on the arms of both Jullian and Calderon; this observation led Early to be concerned that the two were intravenous drug users and to question them about potential withdrawal problems which could occur while they were

incarcerated. While the officers did not find hypodermic needles on the person of either Calderon or Jullian, the officers did find that Calderon was carrying a title to a Chevrolet van which was titled in his name. Noting that Calderon had indicated that he had come to the lake with Jullian, while Jullian had contrarily indicated that the two had not come to the lake together, Early used the vehicle identification number from the title to Calderon's van to determine the van's license plate number. Early then decided to search the area for the van.

At the January 19, 1990, hearing on the defendant's motion to suppress, Early provided the following testimony concerning his reason for searching the area for Calderon's van:

Well, there was several reasons. Number one, we had a person that had fled after being placed under arrest. Number two, we hadn't found any needles on either one of them but obviously there was some intravenous usage by both.

The inconsistency in how they arrived at the lake, I thought there was a very good possibility that the van was in that area somewhere and that possibly this person that had fled the arrest was in that van or close to it.

. . . .

. . . There was shells that did not fit the weapon that we recovered that told me additional weapons were somewhere around.

That same morning, at approximately 5:45 a.m., Nebraska State Trooper Robert Zeiler tested the substance which Tompkins had recovered from Calderon. Zeiler's test revealed that the substance was cocaine, having a street value possibly exceeding $6,000.

In searching a camping area near Harlan County Lake, Sheriff Early and one of his deputies located Calderon's van approximately one-half mile from where Tompkins had earlier arrested Calderon and Jullian. Because the camping area was congested with vehicles and to avoid potential danger to bystanders in connection with a possibly armed escapee, Sheriff Early decided to wait until the van left the camping area before stopping the vehicle or its occupants.

Later that morning, between 7:15 and 7:40 a.m., Calderon's

van was driven to Little Mexico, a restaurant located in Republican City, Nebraska, near Harlan County Lake. Sheriff Early, Trooper Zeiler, and several other officers observed the van in the restaurant's parking lot and determined that they would stop the van after it had left the restaurant. While the officers watched the van they could see some movement inside the van. Between 7:45 and 8:30 a.m., the defendant and a companion, Granville Cross, left the restaurant and entered the van. With the defendant riding as a passenger in the van, Cross drove the van onto the highway. The officers then stopped the van and, using the public address system in a patrol vehicle, instructed the defendant and Cross to get out of the vehicle.

After the defendant and Cross had stepped out of Calderon's van, the officers ordered them to lie on the ground and then conducted pat-down searches. The record is not entirely clear whether the defendant was handcuffed at the time he was searched. While the officer who conducted the search, State Trooper Tom Nutt, testified that the defendant was handcuffed during the search, the defendant testified that his hands were on his head when he was searched, and Deputy Tompkins testified that the defendant's hands were stretched out away from his sides during the search.

While searching the defendant, the officers retrieved from one of his pockets a small plastic gram scale and a small metal tube that contained a residue which Trooper Zeiler suspected to be cocaine. Zeiler testified that such a gram scale is typically used in the street distribution of controlled substances and that such a metal tube is typically used to ingest cocaine or methamphetamine. The defendant was then arrested for possession of drug paraphernalia and a controlled substance. Laboratory analysis of the residue on the tube did in fact show that the residue was cocaine.

In his motion to suppress and again at trial, the defendant objected to the introduction of the gram scale, the metal tube, and the residue on the tube, claiming that they were products of an illegal search in violation of the 4th and 14th Amendments to the U.S. Constitution and in violation of the Nebraska Constitution. The defendant contends that the trial court erred in overruling his objection.

In determining the correctness of a trial court's ruling on a motion to suppress, an appellate court will uphold a trial court's findings of fact unless those findings are clearly erroneous. *State v. Masat*, 239 Neb. 849, 479 N.W.2d 131 (1992).

In deciding whether the trial court's findings on a motion to suppress are clearly erroneous, the reviewing court recognizes the trial court as the finder of fact and takes into consideration that the trial court has observed the witnesses testifying regarding the motion. *State v. Masat, supra.*

The defendant concedes that under the circumstances in this case, the officers were justified in conducting an investigatory "*Terry* stop" with respect to Calderon's van and its occupants. See, *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State v. Twohig*, 238 Neb. 92, 469 N.W.2d 344 (1991).

As stated in *Terry v. Ohio*, 392 U.S. at 30:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

However, while conceding that a "*Terry* stop" was justified, the defendant contends that the scope of the officers' search went beyond that permitted by *Terry v. Ohio* and that, therefore, it was constitutionally impermissible.

It appears from the record that the search of the defendant did go beyond the "carefully limited" weapons search envisioned by *Terry*. Trooper Nutt testified that the purpose of the "pat down" he conducted was to look for both firearms and controlled substances. However, if the officers had probable cause to arrest the defendant prior to the search, and if the search was within the scope of a search which may be conducted

incident to a lawful arrest, then the evidence obtained from the search was properly admitted. See, *State v. Twohig, supra*; *State v. Roach*, 234 Neb. 620, 452 N.W.2d 262 (1990).

When a law enforcement officer has knowledge, based on information reasonably trustworthy under the circumstances, which justifies a prudent belief that a suspect is committing or has committed a crime, the officer has probable cause to arrest without a warrant. *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992).

Probable cause for a warrantless arrest exists if, under the totality of the facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the suspect had committed a crime. *State v. Roach, supra*.

We believe the facts in this case gave the law enforcement officers probable cause to arrest the occupants of Calderon's van, one of whom was the defendant. Only hours before the defendant was arrested, Calderon had been arrested and found to be in possession of cocaine having a street value possibly exceeding $6,000. Later, after it was found that Calderon was carrying the title to a Chevrolet van, Calderon apparently attempted to conceal the fact that the van was in the area by telling the officers that he had ridden to the area with Jullian. In addition, one of two companions arrested with Calderon escaped and fled to avoid arrest.

Further compounding suspicions concerning the occupants of Calderon's van was the likelihood of additional weapons existing within the van, for along with one firearm, the officers also recovered ammunition for other unrecovered weapons when they arrested Calderon. Courts, along with law enforcement personnel, have recognized that weapons and drug dealers go hand in hand. See *State v. Groves*, 239 Neb. 660, 477 N.W.2d 789 (1991).

Given the cocaine which Calderon was found to possess, the arrest and subsequent escape of Calderon's companion, Calderon's apparent attempt to conceal the nearby presence of his van, and the insertion of weapons into the subject equation, officers could prudently believe that the occupants of the van illegally possessed a controlled substance and that one of the

occupants of the van was their escapee.

Despite circumstances which provided officers with probable cause to arrest him, the defendant contends that because officers stated that they arrested defendant for possession of items found during the arrest, the State is attempting to justify the arrest and search with evidence found during the search. It is true that "a search before an arrest, and claimed to be an incident of the arrest, cannot serve as a basis for the validity of the arrest." *State v. Twohig*, 238 Neb. 92, 107, 469 N.W.2d 344, 354 (1991). " ' "[J]ustify[ing] the arrest by the search and at the same time . . . the search by the arrest," just "will not do." ' " *Id.*, quoting *Smith v. Ohio*, 494 U.S. 541, 110 S. Ct 1288, 108 L. Ed. 2d 464 (1990).

However, as explained in *State v. Roach*, 234 Neb. at 625, 452 N.W.2d at 266:

> The validity of a search incident to a lawful warrantless arrest depends on the legality of the arrest itself. It is not necessary that an actual formal arrest occur before a search is undertaken, as long as probable cause for arrest does exist prior to the search. The constitutional issue regarding a reasonable search as an incident to arrest depends upon the presence or absence of probable cause for that arrest, that is, whether immediately before the search an officer has probable cause to believe that the person to be searched has committed a crime.

Furthermore, where a formal arrest follows quickly on the heels of a challenged search, it is not particularly important that the search preceded the arrest, so long as the fruits of the search are not necessary to support probable cause for the arrest. See, *Rawlings v. Kentucky*, 448 U.S. 98, 100 S. Ct 2556, 65 L. Ed. 2d 633 (1980); *State v. Twohig, supra*; *State v. Roach*, 234 Neb. 620, 452 N.W.2d 262 (1990). Thus, "a search without a warrant before an arrest, also without a warrant, is valid as an incident to the subsequent arrest if (1) the search is reasonably contemporaneous with the arrest and (2) probable cause for the arrest exists before the search." *State v. Twohig*, 238 Neb. at 107, 469 N.W.2d at 354.

In the present case, the officers had probable cause to arrest the defendant before searching him, and their search was

reasonably contemporaneous with the arrest. In addition, there is no question that the scope of the officers' search remained within constitutionally permissible limits. See *State v. Twohig, supra.* Consequently, the trial court properly admitted the evidence which the officers seized when they searched the defendant.

The defendant's second summarized assignment of error alleges that to the extent that the trial court's finding of guilt rested on evidence derived from a cooler found within Calderon's van, the finding is not supported by the evidence. This assignment of error stems from the fact that after arresting the defendant, the officers searched the van and discovered a cooler which was found to contain cocaine. The record, however, shows that the trial court did not rely on this evidence and explicitly stated that it had reasonable doubt that the evidence contained within the cooler could be associated with the defendant.

The Supreme Court will not set aside a verdict in a criminal case when the verdict is supported by relevant evidence. *State v. Melton*, 239 Neb. 576, 477 N.W.2d 154 (1991); *State v. West*, 238 Neb. 939, 473 N.W.2d 81 (1991). Only when the evidence lacks sufficient probative force as a matter of law may the Supreme Court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Melton, supra.*

The evidence in this case is sufficient to support the finding of guilty beyond a reasonable doubt. The judgment is, therefore, affirmed.

AFFIRMED.