STATE OF NEBRASKA, APPELLEE, V. ROOSEVELT PARTEE, ALSO KNOWN AS ROOSEVELT PARTEE, JR., APPELLANT.

482 N.W.2d 272

Filed April 10, 1992.    No. S-90-1018.

Arthur C. Toogood, Adams County Public Defender, for appellant.

Don Stenberg, Attorney General, Mark D. Starr, and, on brief, Susan M. Ugai for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Defendant-appellant, Roosevelt Partee, was convicted of being a felon in possession of a firearm, in violation of Neb. Rev. Stat. § 28-1206 (Reissue 1989), and was determined to be a habitual criminal within the purview of Neb. Rev. Stat. § 29-2221 (Reissue 1989). He was thereafter sentenced to imprisonment for a period of not less than 20 nor more than 50 years. He asserts the district court erred in (1) overruling his motion to suppress certain evidence, (2) receiving an exhibit concerning a prior conviction, and (3) imposing an allegedly excessive sentence. We affirm.

Shortly after 5 p.m. on December 23, 1989, Officer Michael

Kottwitz and Sgt. John Stevens of the police force of the city of Hastings were dispatched to a "shots fired" scene, where they were joined by Officer Charles Morgan.

After the three officers drew their service revolvers, Stevens knocked on the door of the Hastings house to which they had been sent. The knock was answered by James Thomas, who stated that he "wasn't the one, that the guy with the gun was in the" house. The officers entered and, for purposes of safety, conducted a pat search of Thomas; no weapon was discovered on him.

When Kottwitz entered the living room, he found Partee sitting on a chair. Partee and the immediate surroundings, including the chair on which he had been sitting, were then searched. The officers found no gun or other weapons. After this search was completed, the officers reholstered their revolvers. Next, Kottwitz asked Partee where the gun was, and Partee responded that his sister had taken it to Arkansas.

Stevens then questioned Partee's wife, twice asking her about the gun. Each time, the wife denied knowing anything about it. Stevens then went outside and talked to Thomas and Partee's daughter. The daughter told Stevens that when she arrived at the house, Partee, Kathy Schilling, and others were on the porch and that Partee later produced a weapon and fired at Schilling. Based on this statement, Stevens again talked to the wife.

Stevens told the wife that he knew there was a gun in the house which had been involved in a shooting and that he wanted her to produce it. He told her he could get a search warrant and would search the house if he had to, but that "it would be best if she would produce the gun." Stevens testified that he did not threaten the wife, nor did he tell her that she would be arrested if she did not produce the gun. According to Stevens, there were no promises made to her about what would happen if she did produce the weapon. At this point the wife took Stevens into a back bedroom and lifted the mattress on the bed; an automatic handgun was lying on the supporting inner springs.

Stevens took the gun and handed it to one of the other officers, who removed the clip. A fired shell was found jammed in the breech of the weapon. Partee was then arrested and

transported to the sheriff's department, where he was read the *Miranda* warnings.

Partee filed a motion to suppress "any and all evidence seized which was the fruit and product of any illegal search of the defendant's person and immediate surroundings . . . ." The testimony detailed above was elicited at the hearing regarding the motion to suppress. In addition, the wife testified that she was under the impression that if she gave up the gun, no one would be arrested. She also stated that an officer told her that "if they didn't get that gun they were going to tear the house apart to get it." She said she got the gun because she was scared and did not know what the officers were going to do.

Although the wife testified that she had the impression no one would be arrested if she got the gun, she admitted that all the officers did was to request the weapon:

Q- When the officer asked you if the gun was there and you said that it wasn't, why did you tell them that?

A- Because I was scared.

Q- Who were you scared of?

A- Of the situation.

Q- Had any of the officers threatened you?

A- No, they didn't threaten me. That was all he said to me.

Q- Did anybody at any time, any of the officers threaten you?

A- No, that was the only thing they said to me.

Q- Was this kind of an exciting and upsetting experience for you?

A- Yeah, you could call it that.

Q- Did anybody promise you anything in order to get you to produce the gun?

A- Well, I was under the impression that if I gave up the gun nobody would be arrested.

Q- When you had that impression where did it come from?

A- From the policeman.

Q- What did he say that supported that impression?

A- All he said was they just wanted the gun. That was all they wanted was the gun. And I can't remember if that was

before he told me they would tear the house apart to get it or after because I can't remember.

The wife also testified that she lived at the house in question and that she shared with Partee the bedroom where the gun was found.

The district court overruled Partee's motion. Partee thereafter waived his right to a jury, and the matter proceeded to a bench trial. The onscene officers again testified to the events they described at the hearing on the suppression motion. In addition, two eyewitnesses identified Partee as the individual they had seen firing a gun. Julie Wills, another occupant of the house, also testified that she had seen Partee firing the gun inside the house earlier in the day.

In addition, Hastings police officer Lee Beach testified that a test he conducted revealed heavy tracings of metal on Partee's right hand, a finding consistent with Partee's handling of a weapon. A gunpowder residue test conducted by Beach also "indicated [Partee] had fired a weapon with his right hand."

At the enhancement hearing held after Partee had been adjudicated guilty, the district court received into evidence three exhibits which attest to Partee's convictions of two prior felonies, a 1970 case from the State of Arkansas and a 1976 case from Douglas County in this state.

Partee first asserts the district court erred in overruling his motion to suppress the gun and clip retrieved by the police. It is well established that in order to preserve error attributed to the overruling of a motion to suppress evidence, it is necessary that the movant make a specific objection at trial to the offer of the evidence which was the subject of the suppression motion. *State v. Tejral, ante* p. 329, 482 N.W.2d 6 (1992); *State v. Mahlin*, 236 Neb. 818, 464 N.W.2d 312 (1991). It is also well established that in order to be timely, an objection must ordinarily be made at the earliest opportunity after the ground for the objection becomes apparent. *Bloomquist v. ConAgra, Inc., ante* p. 135, 481 N.W.2d 156 (1992); *State v. Archbold,* 217 Neb. 345, 350 N.W.2d 500 (1984). Here, Partee allowed the State to adduce evidence concerning the gun and clip and to display them to the finder of fact long before they were offered in evidence, when Partee objected for the first time. Indeed,

Partee cross-examined various witnesses concerning the items prior to their admission. Under these circumstances, Partee may well have waived any objection he may otherwise have had to the receipt of the gun and clip into evidence. However, we do not decide that question, for the district court did not err in overruling Partee's motion to suppress the articles.

In determining the correctness of a trial court's ruling on a motion to suppress, an appellate court will uphold the trial court's findings of fact unless those findings are clearly erroneous. *State v. Kimminau, ante* p. 176, 481 N.W.2d 183 (1992); *State v. Tingle,* 239 Neb. 558, 477 N.W.2d 544 (1991). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, an appellate court recognizes that the trial court observed the witnesses. *Kimminau, supra; Tingle, supra.*

Before commenting on the evidence in regard to the search in this case, we recall that the right to be free from an unreasonable search and seizure, as guaranteed by U.S. Const. amends. IV and XIV and by Neb. Const. art. I, § 7, may be waived by consent. See, *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *State v. Prahin,* 235 Neb. 409, 455 N.W.2d 554 (1990); *State v. Juhl,* 234 Neb. 33, 449 N.W.2d 202 (1989). In order for the consent to search to be effective, however, it must be a free and unconstrained choice and not the product of a will overborne. *Schneckloth v. Bustamonte, supra; State v. Prahin, supra.* In essence, any consent must be given voluntarily and not as the result of duress or coercion, whether express, implied, physical, or psychological. *State v. Prahin, supra.* Mere submission to authority is insufficient to establish consent to a search. *State v. Walmsley,* 216 Neb. 336, 344 N.W.2d 450 (1984).

Partee does not question the wife's standing to consent to the search, but claims she did not consent voluntarily. The question of whether a consent to search was given voluntarily is to be determined from all the circumstances surrounding the search. *Schneckloth v. Bustamonte, supra; State v. Prahin, supra; State v. Bowen,* 232 Neb. 725, 442 N.W.2d 209 (1989); *State v. Sutton,* 231 Neb. 30, 434 N.W.2d 689 (1989); *State v. Walmsley, supra.* Finally, it is the State that carries the burden of showing

the consent was voluntary. *State v. Prahin, supra.*

The defendant in *State v. Rathburn*, 195 Neb. 485, 489-90, 239 N.W.2d 253, 256 (1976), contended he did not consent to a search of his automobile trunk because he had originally refused to open it and agreed to open it only after the police officer stated: " 'Okay, I'll get a warrant.' " In rejecting the claim that the officer's statement was coercive, we stated at 195 Neb. at 490, 239 N.W.2d at 256:

> There is no doubt that false assertions that one already *has* a warrant will vitiate a consent to search. Bumper v. North Carolina, [391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968)]. However, under the facts of the instant case, all the officer said was that he would *get* a warrant. In situations where the searching officer has stated that he could obtain or was in the process of getting a warrant, the courts have never found such a statement coercive per se. Rather, the courts have generally looked at the statement made by the officer to determine if it was coercive in the particular factual situation.

(Emphasis in original.)

The evidence here supports the conclusion that all the officers told the wife was that a warrant to search the house could be obtained, but that it "would be best" if she produced the gun. The wife admits that she was not threatened. Her impression that no one would be arrested if the gun were produced was unfounded. Whatever the source of the impression, it was not a reasonable interpretation of what she was told. It therefore cannot be said the district court was clearly wrong in finding that the wife's consent was given voluntarily.

Partee next contends that the district court erroneously received the record of his 1970 plea-based Arkansas conviction because it does not reveal that he voluntarily and intelligently waived his rights as required by *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969).

The matter is significant because Partee could not be sentenced as a habitual criminal unless the record establishes that he was "twice convicted of crime." § 29-2221. In the absence of a specified greater punishment for an offense, a

habitual criminal is subject to imprisonment for a period of not less than 10 nor more than 60 years. § 29-2221. In contrast, a nonhabitual criminal convicted of being a felon in possession of a firearm is subject to imprisonment for a maximum period of 5 years. Neb. Rev. Stat. § 28-105 (Reissue 1989); § 28-1206.

The difficulty from Partee's point of view is that we have consistently held that in order to prove a prior plea-based conviction for habitual criminal and other enhancement determinations, the State need only establish that at the time of the prior conviction the defendant had, or waived, counsel. *State v. Tejral, ante* p. 329, 482 N.W.2d 6 (1992); *State v. Crane, ante* p. 32, 480 N.W.2d 401 (1992); *State v. Johns,* 233 Neb. 477, 445 N.W.2d 914 (1989); *State v. Oliver,* 230 Neb. 864, 434 N.W.2d 293 (1989). Challenges claiming that a plea-based conviction is constitutionally infirm because the defendant did not voluntarily and intelligently waive his or her other *Boykin* rights constitute an impermissible collateral attack on the conviction. *Tejral, supra; Crane, supra; Oliver, supra.* A defendant cannot in a habitual criminal or other enhancement determination collaterally attack a prior plea-based conviction. *Tejral, supra; Crane, supra; Johns, supra; Oliver, supra.*

The exhibit in question, an authenticated copy of the Arkansas court's docket sheet, reflects that Partee pled guilty to second degree murder and that the plea was "concured [sic] in by his attorney." In addition, the name of the attorney listed on the docket sheet after Partee's name is the same as that of the attorney for Partee listed on an Arkansas Department of Corrections' document. The exhibit thus clearly establishes that Partee was represented by counsel at the time of the subject conviction. Accordingly, the district court committed no error in receiving the exhibit in evidence.

Partee's claim in his third and last assignment of error, that the district court abused its discretion in sentencing him as it did, can only be described as outrageous.

The record reveals that Partee has a long history of violent criminal conduct, including two murder convictions, one of which was for killing his then wife. The incident in question occurred within 5 days of his most recent release from jail.

As we repeatedly reaffirm, a sentence imposed within the statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Schumacher, ante* p. 184, 480 N.W.2d 716 (1992); *Tejral, supra*; *State v. Wilcox*, 239 Neb. 882, 479 N.W.2d 134 (1992); *State v. Start*, 239 Neb. 571, 477 N.W.2d 20 (1991); *State v. Kosmicki*, 239 Neb. 358, 476 N.W.2d 550 (1991). In no sense can the sentence imposed be said to constitute an abuse of the district court's discretion.

AFFIRMED.

WHITE, J., concurring in part, and in part dissenting.

I agree that the evidence amply supports the conviction of the substantive offense, but for the reason last stated in *State v. Crane, ante* p. 32, 480 N.W.2d 401 (1992) (White, J., dissenting), I dissent from the portion of the opinion which sustains the enhancement proceeding.

SHANAHAN, J., dissenting.

As noted in my dissent filed in *State v. Tejral, ante* p. 329, 482 N.W.2d 6 (1992), and as previously observed in my dissents in *State v. Crane, ante* p. 32, 480 N.W.2d 401 (1992), *State v. Johns*, 233 Neb. 477, 445 N.W.2d 914 (1989), and *State v. Oliver*, 230 Neb. 864, 434 N.W.2d 293 (1989), Nebraska's criminal procedure, evolving through decisions of this court, precludes a defendant's inquiry to determine whether the defendant's prior plea-based conviction used for enhancement of penalty is constitutionally valid in accordance with due process required by *Boykin v. Alabama*, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), and *State v. Irish*, 223 Neb. 814, 394 N.W.2d 879 (1986). Hence, I dissent to the continuous denial of due process reflected by and inherent in *Partee*.