STATE OF NEBRASKA, APPELLEE, V. PHILLIP E. BOWEN, APPELLANT.

442 N.W.2d 209

Filed June 30, 1989.    No. 88-736.

726

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns for appellant.

Robert M. Spire, Attorney General, and Kenneth W. Payne for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

Defendant-appellant, Phillip E. Bowen, was convicted by a jury in the district court for Douglas County of murder in the first degree and use of a firearm to commit a felony, in violation of Neb. Rev. Stat. §§ 28-303(2) and 28-1205(1) (Reissue 1985). He was sentenced to life imprisonment on the murder charge and to a consecutive term of 1 to 6 years' imprisonment on the weapons charge.

Defendant timely appealed to this court, alleging the district court erred in overruling his motions to suppress physical evidence and statements and allowing said evidence to be admitted at trial. Defendant further contends that the evidence was insufficient, as a matter of law, to sustain his convictions. We affirm.

The record shows the following. The elderly victim, Mary Jirsak, owned and operated Jirsak's Confectionery, a candy

store located at 1418 South 13th Street in Omaha. Jirsak also resided at this address.

On February 18, 1988, at approximately 9:15 a.m., Jirsak was talking on the telephone with her sister, Rose Kojdecki. During their conversation, Jirsak asked Kojdecki to "hold on" because Jirsak had a customer. A few seconds later, Kojdecki heard Jirsak scream loudly and say, "Get out of here. I don't have any money." Kojdecki hung up the telephone and called 911.

Edward Mobley, who operated the welding shop next door to Jirsak's Confectionery, testified that he went to work shortly after 9 a.m. on February 18. As Mobley was walking north on 13th Street, he heard a scream and something that sounded like a "pop." As Mobley continued walking, he saw two men leave the candy store. Both men appeared fairly young, about 18 to 20 years old. One had "long, blondish, . . . scraggly hair." The other was wearing an orange stocking cap with eyeholes, which covered most of his face. As he walked past the two men, Mobley noticed that the man wearing the stocking cap was carrying a "Luger-type" handgun against his chest. Mobley realized something had happened and went into his shop and called 911. He then went to Jirsak's Confectionery and saw the victim lying on the floor.

Police officers were dispatched to the scene at 9:31 a.m. and discovered Jirsak's body lying in the doorway of the candy store. An ambulance was summoned. There was a large amount of blood under her head, and a shell casing was discovered just inches from the body. It was later determined that Jirsak died from a single gunshot wound to her head.

During the course of their investigation, the officers searched the candy store and discovered a chair that had been knocked over and the contents of Jirsak's purse scattered on the floor. The officers also discovered some dimes, an envelope that was ripped open, and a piece of a dollar bill on the floor behind a counter. Jirsak's telephone was off the hook.

While the officers were conducting their investigation, Mack Riggs, a 17-year-old neighbor, heard about the shooting and went to Jirsak's Confectionery about 11:30 a.m. After he found out how many men were involved in the shooting and that a

.22-caliber weapon had been used, Riggs told Officer Paul Briese that he thought he knew who did it. Riggs then told Briese that 2 weeks prior, defendant had telephoned and asked if Riggs wanted to help defendant rob the candy store. Riggs testified that he had subsequent telephone conversations with defendant and Christopher Bazer 2 days prior to the shooting.

Riggs agreed to show police officers two places where defendant and Bazer might be staying, and then went with the officers in a police cruiser. Based on Riggs' information, the officers first went to defendant's mother's house at 3006 South 17th Street in Omaha, but no one was home. The officers then went to 6708 Pacific Street in Omaha, the home of defendant's sister, Vicki Strunk.

The officers, who did not have an arrest warrant or a search warrant, arrived at Strunk's house at 12:10 p.m. Officers Sklenar and Lenker went to the front door of the house, while Officers Wilson and Ivener went to the back. Sklenar knocked on the front door. Strunk answered and gave permission for the officers to enter the house. When Sklenar asked if defendant was there, Strunk said he was and pointed to the kitchen, where defendant was talking on the telephone. Defendant was placed under arrest.

While Ivener was standing outside the back door of Strunk's house, he saw three or four persons, including one individual who matched Bazer's description, go down to the basement. Ivener then saw all these individuals come back upstairs. At this time, defendant's uncle, Larry Bowen, saw Ivener standing at the back door. Larry Bowen told Ivener that defendant and Bazer were in the house, and Ivener entered the house through the back door. He and another officer went into the basement to search for Bazer, but did not find him. Officers Sklenar, Ivener, Lenker, and Wilson then obtained permission from Strunk to search the house for Bazer. They eventually found Bazer hiding in the rafters of the house.

Officer Briese arrived at the Strunk residence 5 to 7 minutes after Sklenar and entered the house through the back door. Larry Bowen summoned Briese to the basement and directed him to the east wall. Larry Bowen directed Briese's attention to a .22-caliber Luger-type weapon lying on a blue foam mattress

and told Briese that the weapon had been covered up by a yellow blanket.

Briese followed Larry Bowen back upstairs and, at 12:27 p.m., advised Sklenar of the location of the gun. Sklenar testified that while Briese was in the basement, Sklenar had been filling out a permission to search form. The form was executed by Vicki Strunk at 12:25 p.m. and authorized Officers Sklenar, Lenker, Briese, Wilson, and Ivener to search her residence at 6708 Pacific.

Defendant was taken to police headquarters and advised of his *Miranda* rights. He waived his *Miranda* rights and agreed to talk to Officers Wilson and Lenker about the Jirsak homicide. The questioning began at 2:25 p.m. Defendant told the officers that Bazer had come to Strunk's residence several days before the homicide and that Bazer had a .22-caliber automatic nine-shot handgun on that occasion.

Defendant also stated that on the night of February 17, 1988, he and Bazer talked about robbing a bar in North Omaha. Defendant and Bazer stayed at the Strunk residence on the night of February 17. The next morning, Bazer wanted to see an individual named "Tim" to get $1,500 from a drug transaction "ripoff" in which Bazer and Tim had been involved. Defendant and Bazer called defendant's brother-in-law, Dale Demont, to give them a ride.

Demont picked up defendant and Bazer at 9 a.m. at Strunk's home. When defendant, Bazer, and Demont left the house, defendant was wearing a red and orange stocking cap. Defendant told the officers that they first went to defendant's mother's residence so that defendant could borrow some money from his mother. Defendant then said he wanted to "pick a bone" with Riggs, who had turned defendant in a few days before on a burglary charge in Sarpy County. They drove by Riggs' house but did not stop because Riggs' car was not there.

Defendant then said he wanted to get some candy, so Demont dropped defendant and Bazer off at Jirsak's Confectionery. Defendant stated that Bazer then announced his intent to rob the old lady in the candy store and that defendant tried to talk Bazer out of committing the robbery.

Defendant stated that when he and Bazer walked into the

candy store, Jirsak was on the telephone in the back room. Jirsak came to the front of the store, and defendant purchased some licorice and pop. After defendant paid for these items, Jirsak went to the back room to get the pop. Defendant stayed at the front of the store, but Bazer followed Jirsak to the back. Defendant told the officers he saw Bazer pull out a gun and ask Jirsak for money. Defendant stated that he then realized what Bazer was doing and pulled the stocking cap down over his face to avoid being recognized in the store. He saw Bazer empty Jirsak's purse out onto the floor.

Defendant then saw Bazer take some change from the cash register. He stated that when Jirsak screamed and tried to get out the door, Bazer grabbed her from behind. At this point, defendant ran out the door and started to run south on 13th Street. He heard a gunshot report when he was several steps south of the door.

Demont drove Bazer and defendant back to Strunk's house. Defendant informed the officers that inside the car Bazer showed that he had taken approximately $6 in change and $20 in currency.

After making the foregoing statements to Wilson and Lenker, defendant was readvised of his *Miranda* rights and agreed to give a taped statement at police headquarters. The taped statement began at 2:56 p.m. and is substantially similar to defendant's untaped statements to Wilson and Lenker. This tape was admitted into evidence and played for the jury.

Demont testified that defendant telephoned him at 8:30 on the morning of February 18, 1988, and said he needed a ride somewhere. Demont picked up defendant and Bazer at Strunk's house. Defendant was wearing an orange hat. When Demont asked defendant and Bazer where they were going, they told him to "[h]ead down towards 13th Street." While they were in the car, defendant and Bazer informed Demont that they were going to commit a robbery. Defendant showed Demont where to drop them off, and told Demont to park on 15th Street and wait. Demont waited on 15th Street for 10 to 15 minutes, drove around the block, and eventually picked up defendant and Bazer. Bazer sat in the front seat, pulled out a gun, and laid it on the seat. Demont testified that Bazer also pulled out an

envelope of money. Defendant, who was sitting in the middle of the back seat, indicated that he got some change out of the register and showed Bazer and Demont a handful of change. The three men returned to Strunk's house.

Vicki Strunk testified that Bazer woke her up at 11 a.m. on the day in question and told her he had shot Jirsak. When Strunk said she did not believe him, Bazer told her to watch the news. Vicki Strunk's estranged husband, Gary Strunk, also was at the house when Bazer and defendant returned. Gary Strunk testified that Bazer appeared nervous, told him to watch the 12 o'clock news, and then went to the basement.

Vicki Strunk further testified that after she and Gary Strunk watched the noon news, they went downstairs to wake up defendant and Bazer. She told Larry Bowen to tell Bazer to get the gun out of the house and to leave. This discussion took place 1 or 2 minutes before the police arrived.

In his "Motion to Suppress the Defendant's Confession," defendant alleged that his taped statement made to Officers Lenker and Wilson on the afternoon of February 18, 1988, was inadmissible because it was coerced. In his motion to suppress "any and all items" of physical evidence, defendant challenged the warrantless search of the residence at 6708 Pacific Street, alleging that there was no probable cause to search the residence, that the information provided by Larry Bowen was not reliable, and that Vicki Strunk's consent to search was not voluntary. Defendant further alleged in his motion to suppress physical evidence that the warrantless "search, seizure and subsequent arrest of the Defendant lacked probable cause" and was not justified by exigent circumstances.

Defendant first contends the district court erred in failing to suppress his taped statement of February 18, 1988, and all physical evidence, including the murder weapon, seized at 6708 Pacific Street, because this evidence was obtained pursuant to an illegal warrantless search prohibited under the holding of *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).

Throughout the trial, defendant maintained that he resided with his sister at 6708 Pacific Street. There is other evidence suggesting, and defendant so informed the investigating

officers on the day of the murder, that he lived with his mother at 3006 South 17th Street. In considering defendant's assignments of error, we assume, without deciding, that defendant resided at 6708 Pacific Street.

At a hearing to suppress evidence, the court, as the trier of fact, is the sole judge of the credibility of witnesses and the weight to be given to their testimony and other evidence. In determining a court's ruling as a result of a suppression hearing, the Supreme Court will not reweigh or resolve conflicts in the evidence, but will uphold the trial court's findings of fact unless those findings are clearly wrong. *State v. Andersen, ante* p. 187, 440 N.W.2d 203 (1989); *State v. Sutton,* 231 Neb. 30, 434 N.W.2d 689 (1989).

Vicki Strunk testified at the suppression hearing that she rented the house at 6708 Pacific Street, that her name alone was on the lease, that she made all the rent payments, and that she normally resided in the house with her three children, her 4-year-old nephew, and her uncle, Larry Bowen, who lived in the basement. Strunk further testified that the police officers came to her door "right after the noon news":

Q. All right. And as soon as you saw them, you knew what they were there for, didn't you?

A. Well, after [Bazer] told me to watch the news, I kind of figured that's probably what they were there for. . . .

Q. All right. There was a . . . story about this shooting on South 13th Street and a description of the two suspects that were seen leaving the scene, and that matched Chris and Phillip, correct?

A. I guess it did. It probably would.

Q. Right. Plus Chris told you that he did it?

A. Right.

The police officers showed Strunk their badges when she answered the door. They asked her if they could come in, and she said, "Yes." The officers then asked her if defendant and Bazer were there. Strunk then "took them in" and pointed to defendant, who was talking on the telephone in the kitchen. Although Strunk claimed she had not voluntarily signed the permission to search form, she also testified that when she signed the form, she told the officers, "Yes, I'll sign it. I ain't

got nothing to hide."

Larry Bowen testified at the suppression hearing that he was present when the gun was found downstairs. Bowen testified that after he "did find the gun and trip over it," he called to a police officer to come to the basement. The officer came downstairs but did not take possession of the gun.

In *Payton v. New York, supra*, the Court held that the 4th amendment to the U.S. Constitution, made applicable to the States by the 14th amendment, prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. See, also, *State v. Hert*, 220 Neb. 447, 370 N.W.2d 166 (1985); *State v. Ware*, 219 Neb. 594, 365 N.W.2d 418 (1985). In *State v. Ware, supra* at 597, 365 N.W.2d at 420, we noted that the emphasis of the *Payton* decision was "upon the breach of privacy entailed in entering an individual's home." We concluded in *Ware* that because the police lawfully crossed the defendant's threshold pursuant to a valid search warrant, the concerns of the *Payton* Court had been met, and the warrantless arrest of the defendant was lawful.

We held in *State v. Daniels*, 222 Neb. 850, 388 N.W.2d 446 (1986), that a warrantless search of a house may be justified when the police have obtained the consent to search from a party who possessed common authority over, or other sufficient relationship to, the premises sought to be inspected. See, also, *State v. Billups*, 209 Neb. 737, 311 N.W.2d 512 (1981).

Vicki Strunk clearly had the authority to consent to the search of her residence at 6708 Pacific Street. The issue raised at the suppression hearing was whether her consent was voluntary. The determination of whether a consent to search is voluntarily given is a question of fact, and voluntariness is to be determined from the totality of the circumstances. *State v. Bonczynski*, 227 Neb. 203, 416 N.W.2d 508 (1987). The trial court noted there were conflicts in the evidence, but resolved these conflicts against the defendant. From our review of the record, we find there was evidence to support the trial court's ruling that Strunk's consent to search was voluntarily given.

Vicki Strunk testified that Larry Bowen resided in the

basement of the Strunk home on the date of the search. He had common authority over the basement to consent to a search of the basement for the murder weapon. *State v. Daniels, supra.*

As in *State v. Ware, supra,* since the police lawfully crossed the threshold of the Strunk residence, the concerns of the *Payton* Court were met, and the warrantless arrest of the defendant was lawful.

Defendant further contends the trial court erred in failing to suppress his taped statement because the statement was coerced. The trial judge found that "the statement made to the police officers at headquarters was freely and voluntarily made after the defendant was fully advised of his constitutional rights and made a knowing and intelligent waiver of those rights." Again, the conflicts in the evidence were resolved against the defendant and the record shows there was ample evidence to support the court's ruling.

Defendant's first assignment of error is without merit.

Defendant further contends the evidence is insufficient to support his convictions, claiming that the State "has to show the Defendant was more than just present and acquiesced to the robbery of Mary Jirsak." Brief for appellant at 10-11. We have often held that in reviewing a criminal conviction, it is not the province of the Supreme Court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the finder of fact, and the verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Andersen, ante* p. 187, 440 N.W.2d 203 (1989); *State v. Wickline, ante* p. 329, 440 N.W.2d 249 (1989).

Defendant was charged with first degree murder, in violation of § 28-303, which provides: "A person commits murder in the first degree if he kills another person . . . (2) in the perpetration of or attempt to perpetrate any . . . robbery . . . ." Defendant also was charged with using a firearm to commit a felony, in violation of § 28-1205.

Neb. Rev. Stat. § 28-324 (Reissue 1985) provides: "A person commits robbery if, with the intent to steal, he forcibly and by violence, or by putting in fear, takes from the person of another

any money or personal property of any value whatever." Neb. Rev. Stat. § 28-206 (Reissue 1985) provides: "A person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender."

Defendant's argument is based on our language in *State v. Morrow*, 220 Neb. 247, 369 N.W.2d 89 (1985), that mere presence, acquiescence, or silence, in the absence of a duty to act, is not enough to constitute one an accomplice and that the knowledge that a crime is being or is about to be committed does not constitute one an accomplice.

The evidence in this case was clearly sufficient to support a jury determination that defendant was at least an aider and abettor in this senseless crime. Mobley testified that he saw a young man, who was wearing an orange stocking cap, leave Jirsak's shop. This man was holding a gun against his chest. Defendant stated he was wearing a red and orange stocking cap on the morning in question. Riggs testified that on two occasions prior to the murder, defendant telephoned and asked whether Riggs would help him rob Jirsak's candy store. Based on Riggs' information, the investigating officers discovered defendant, Bazer, and the murder weapon at 6708 Pacific Street.

Demont testified that defendant directed him to drive to 13th Street and that on the way there, defendant and Bazer said they were going to rob some place. Defendant told Demont to drop him off between 13th and 14th Streets and to wait on 15th Street. After 10 to 15 minutes, defendant and Bazer got back in the car. Demont testified that Bazer laid a gun on the front seat and that defendant indicated he took some change out of the register.

Notwithstanding defendant's trial testimony that he did not know Bazer intended to rob Jirsak when they entered the candy store and that defendant tried to persuade Bazer to leave, the evidence is sufficient to support a finding that defendant's involvement in the robbery and murder of Mary Jirsak was substantially more than a mere presence, acquiescence, or silence.

Taking the view most favorable to the State, the evidence is

sufficient to support defendant's convictions.

The judgment of the district court is affirmed.

AFFIRMED.