STATE OF NEBRASKA, APPELLEE, V. DARWIN J. ROBINSON, APPELLANT.

448 N.W.2d 386

Filed November 17, 1989.    No. 82-028.

Thom K. Cope, of Bailey, Polsky, Cada, Cope & Wood, for appellant.

Robert M. Spire, Attorney General, and Lynne R. Fritz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. INTRODUCTION

In this reinstated appeal, defendant, Darwin J. Robinson, challenges his convictions pursuant to verdicts on charges of robbery, in violation of Neb. Rev. Stat. § 28-324 (Reissue 1985), and the use of firearms to commit a felony, in violation of Neb. Rev. Stat. § 28-1205(1) (Reissue 1985), and of being a habitual criminal as defined in Neb. Rev. Stat. § 29-2221 (Reissue 1985). His seven assignments of error combine to urge that the trial court erred (1) in declining to suppress certain evidence and (2) in submitting the robbery and firearms charges to the jury and finding the evidence sufficient to support all the charges. We affirm.

## II. SUPPRESSION TESTIMONY

At the hearing on Robinson's suppression motions, Marvin Pfeifer, the assistant manager of an Omaha Kwik Shop

convenience store, testified that on January 31, 1981, he was on duty between midnight and 7 o'clock that morning. Robinson entered the store around 6:30 a.m., stood by the magazine rack for some time, and engaged Pfeifer in a "four to five" minute conversation about the weather. According to Pfeifer, "Somebody was getting gas, and I was watching . . . . And when I turned around, he had a knife in my back." Pfeifer turned slightly and was able to see both the knife and that Robinson was the person holding it. Pfeifer complied with Robinson's instruction to "[o]pen the register" and, at Robinson's further order, took all the money from the cash register and placed it in Robinson's hand, whereupon Robinson walked out of the store. As he was leaving the store, employee Michael Klaumann was entering. Pfeifer immediately informed Klaumann that Robinson had robbed the store, and subsequently summoned the police.

Pfeifer described the lighting in the store as "excellent" on the morning in question. Thus, he had ample opportunity to see Robinson's face during the half hour or so Robinson was in the store prior to the robbery, and there was no question in his mind but that Robinson was the man who had robbed him. We note Pfeifer's additional testimony that he had never been shown any photographs by the police, had never seen Robinson in any lineup, and, in fact, had not been called upon to identify the robber until the preliminary hearing in this prosecution.

As Klaumann tells it, he arrived for work at the Kwik Shop at about 6:55 that morning, and as he "was pulling into the parking lot . . . saw that there was a man standing behind Marvin behind the counter — the cash register." Klaumann got out of his automobile, and "the man who was behind the counter" walked out of the door as Klaumann was walking in. Klaumann testified that the area was well lit and that he observed the individual well enough to recognize him again; according to Klaumann, "He had been in the store before."

After Pfeifer told him, "[T]hat's the man that robbed me," Klaumann immediately left and followed Robinson. Using his own vehicle, Klaumann followed a white automobile from the Kwik Shop to a parking lot. Klaumann then located a police patrol vehicle, reported what he had seen, and identified the

automobile for police officers. Klaumann admitted that he had not seen the robber get into the white automobile, nor had he seen the driver exit that vehicle. In any event, Klaumann returned to the Kwik Shop. Sometime later the same day, a police officer approached him there and showed him a photograph, which Klaumann identified as depicting the robber. This was the only time police officers showed any photographs to Klaumann; he participated in no other photographic showup.

However, at "around 10 or 11 in the morning," police officers brought Robinson himself to the Kwik Shop in a patrol vehicle. The officers presented Robinson to Klaumann in the store, and Klaumann told the officers that Robinson was the robber. At the suppression hearing, Klaumann again identified Robinson as the man he had seen walking out of the store as he walked in.

Police Officer James Patterson and Sgt. Don Crinklaw were on duty during the early morning hours of January 31, 1981. About 8:20 a.m., Patterson received a report of a stolen automobile. He also learned from police sources that the vehicle had allegedly been involved in a robbery and had been towed away by police. When Patterson and Crinklaw arrived at the location from which the stolen automobile report had originated, a young woman identifying herself as "Shirley Robinson" told them that her automobile had been stolen. Crinklaw asked for a photograph of Robinson, which the young woman gave him. He left for the Kwik Shop with the photograph before learning the young woman's true identity as that of Edna Lyncook, a fact she admitted when later informed by Patterson that the automobile she had reported stolen was suspected of having been used in a robbery and had been towed by police. Lyncook also told Patterson that Robinson was at her residence, an apartment some flights above Robinson's, and that she had left the door unlocked. Officers then went to the Lyncook apartment and arrested Robinson.

Officers also went to Robinson's apartment and awakened the genuine Mrs. Robinson, who apparently had been sleeping in the Robinson apartment, and, according to Patterson, received permission from her to search the apartment for items

of clothing worn by the Kwik Shop robber. Mrs. Robinson, however, denied having given the police permission to search. As a result of the search, police located a blue windbreaker-type jacket, which Klaumann identified as the jacket worn by the robber.

Robinson was then transported to the police station, where he was searched. Fifty dollars in paper money was found in his back pocket in the following denominations: two $10 bills, one $5 bill, and twenty-five $1 bills.

Robinson's first trial ended in a mistrial. A few days later, the district court took up the State's motion to endorse Robert Koppock as a new witness for use at retrial. Robinson objected "as to the relevancy and as to constitutional issues that were raised by this procedure." The district court then conducted a proceeding in the nature of a suppression hearing to determine the admissibility of Koppock's testimony. At the conclusion of that hearing the district court ruled that "that part of the testimony in which [Robinson] described the place that he robbed and admits [the robbery] will be received."

Koppock's testimony establishes that he was himself arrested on unrelated charges, and as a result, the two men met for the first time in the Douglas County Correctional Center. At the time of his arrest and detention, Koppock was working as an informant for the Nebraska State Patrol, primarily in connection with drug-related activities, and was paid a salary of $100 per week. The State Patrol neither planted Koppock at the jail nor assigned Koppock to work on Robinson's case.

Koppock further testified that he shared the same cellblock with Robinson and that Koppock initiated conversation with Robinson by asking him why he was in prison. On this occasion Robinson indicated the matter was none of Koppock's business. Later, Robinson asked Koppock if he could help Robinson raise bail money. Koppock replied, "Well, I might know some people."

The next day, Robinson initiated a conversation "about this place that he held up," giving the location of the robbed store. Robinson also proposed some kind of "deal" with Koppock whereby each would "snuff" the other's witnesses. Koppock made no "real sure commitment" to the proposal but "just

listened," so that Robinson "took it for granted" that Koppock would participate.

In another conversation, which apparently occurred the same day as the one last mentioned while the two were playing basketball, Robinson talked "about how he . . . held up the Quik [sic] Shop," revealing that as Robinson was leaving the robbed premises, "somebody came in . . . and followed him home." Robinson also related that "he went up to the [designated] Quik [sic] Shop . . . with a butcher knife." At the time of the foregoing conversations, Koppock had made no contact with any law enforcement agency concerning the information Robinson had disclosed.

The State Patrol did, however, become involved a couple of days later when it placed a transmitter on Koppock in order to listen to any conversation Koppock might have with Robinson. That same day, Robinson again talked with Koppock about the robbery. During this conversation, Robinson once more described where the robbery occurred and, apparently for the first time, named Pfeifer as the person from whom he took the money.

### III. TRIAL EVIDENCE

Pfeifer and Klaumann were the first witnesses called at the trial which resulted in Robinson's convictions. Their testimony essentially duplicated their suppression hearing testimony. Both men positively identified Robinson in court as the man who had committed the robbery. Several police officers were also called; their testimony, too, essentially repeated that adduced at the suppression hearing. Patterson further testified that the door to Lyncook's apartment was unlocked and that when he and another officer entered the apartment, they found Robinson seated in a chair. Lyncook testified that she had accompanied police officers from Robinson's apartment to her own and that she was present when Robinson was placed under arrest.

Although Lyncook testified that police officers removed Robinson's photograph from his apartment without her permission and after she had admitted to them that she was not the real Mrs. Robinson, Crinklaw testified as he had at the suppression hearing that while laboring under the impression

that Lyncook was Mrs. Robinson, he received permission from her to take Robinson's photograph from the apartment. According to Crinklaw, he left Robinson's apartment with the photograph before learning that the woman who had allowed him to take it was not Robinson's wife.

The State also called Koppock as a trial witness, and he testified substantially as he had in the earlier hearing regarding the statements Robinson made while both were in jail, including Robinson's identification of Pfeifer by name. While Robinson made no objection to Koppock's trial testimony, or indeed to any of the identification testimony adduced at trial, it must be borne in mind that although the law now is that in order to preserve a question as to the admissibility of evidence not ordered suppressed, a criminal defendant must object to that evidence at trial, *State v. Pointer*, 224 Neb. 892, 402 N.W.2d 268 (1987), such objection was not required at the November 1981 trial which resulted in Robinson's conviction, *State v. Van Ackeren*, 200 Neb. 812, 265 N.W.2d 675 (1978).

In the course of the trial the State offered, and the district court received into evidence, over Robinson's objections, the photograph and windbreaker jacket described earlier, as well as the money removed from Robinson's person at the time of arrest.

## IV. ANALYSIS
### 1. Nonsuppression of Evidence

We begin our analysis of the first summarized assignment of error by recalling that on a motion to suppress evidence, the trial court, as the trier of fact, is the sole judge of the credibility of witnesses and the weight to be given their testimony and other evidence. In reviewing a trial court's ruling as a result of a suppression hearing, the Supreme Court will not reweigh or resolve conflicts in the evidence, but will uphold the trial court's findings of fact unless those findings are clearly wrong. *State v. One 1987 Toyota Pickup, ante* p. 670, 447 N.W.2d 243 (1989); *State v. Marcotte, ante* p. 533, 446 N.W.2d 228 (1989); *State v. Bowen,* 232 Neb. 725, 442 N.W.2d 209 (1989); *State v. Andersen,* 232 Neb. 187, 440 N.W.2d 203 (1989); *State v. Martin,* 232 Neb. 385, 440 N.W.2d 676 (1989).

### a. Eyewitness Testimony

Robinson first argues, in sum, that Klaumann's in-court identifications were impermissibly tainted because the police used but one photograph and but one person in showups on the day of the robbery. In effect, Robinson argues that Klaumann identified not the robber in court, but, rather, the person depicted in the one-photograph and the one-person showups, both of which showups were of the allegedly innocent Robinson. Robinson's contentions in this connection are clearly without merit.

This court has recently had occasion to consider the circumstances under which eyewitness identifications may be admissible despite alleged extraneous influences such as those complained of here. *State v. Sardeson*, 231 Neb. 586, 437 N.W.2d 473 (1989); *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988). In *Trevino*, this court noted:

> A claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it. . . . [E]vidence of an extrajudicial identification is admissible when made under circumstances precluding the suspicion of unfairness or unreliability and where the person making the out-of-court identification is present at the trial and subject to cross-examination.
>
> The factors to be considered in determining the likelihood of misidentification . . . are the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

230 Neb. at 510, 432 N.W.2d at 516. See, also, *State v. Sardeson, supra*; *State v. Wickline*, 232 Neb. 329, 440 N.W.2d 249 (1989).

Applying these criteria to the facts of the case presently before us, we note that Klaumann testified that he got a good, clear look at Robinson as their paths crossed in the Kwik Shop doorway on the morning of the robbery and that he recognized

Robinson at that time as one whom he had seen in the store before. Not more than 5 hours passed between this time and the moment police officers presented Robinson's photograph and, later, Robinson himself to Klaumann for identification, a period not so long as to raise a significant likelihood that Klaumann might have forgotten important details or become confused about whom he had seen. These are sufficient indicia of reliability to satisfy foundational requirements for Klaumann's testimony and to present to the jury as a question of fact the weight to be accorded that testimony.

Robinson's apparent argument that Pfeifer made no conclusive identification of Robinson as the robber is simply not supported by the record. The fact of the matter is that Pfeifer, who was never shown a photograph of Robinson, positively identified him as the robber both at the suppression hearing and at the subsequent trial.

### b. Physical Evidence

Regarding use by the State of the items seized in the course of Robinson's arrest, Robinson argues that the photograph and the jacket were illegally seized without benefit of a search warrant and should therefore have been suppressed.

Concerning the jacket, although not without contradiction, there is testimony that Robinson's real wife and coresident with him in their apartment gave police officers permission to search the apartment, in the course of which consensual search the jacket was located and seized. A warrantless search of a house may be justified when the police have obtained consent to the search from a party who possesses common authority over, or other sufficient relationship to, the premises sought to be inspected. *State v. Bowen*, 232 Neb. 725, 442 N.W.2d 209 (1989). Robinson's contention regarding the jacket is without merit.

Concerning the photograph, the record indicates that Lyncook represented herself to be Robinson's wife at Robinson's request, and there is evidence that while in that guise, she permitted police officers to remove the photograph from Robinson's apartment. Insofar as Lyncook was acting at Robinson's request, we have no difficulty holding that when she

permitted police officers to remove the photograph from Robinson's apartment, she was acting within the scope of an "other sufficient relationship to . . . the premises sought to be inspected," *State v. Bowen, supra* at 733, 442 N.W.2d at 214, to render the police officers' act of taking the photograph not constitutionally infirm. Robinson's argument in this connection is also without merit.

Although no complaint appears to be made about the money received in evidence, we nonetheless observe that Neb. Rev. Stat. § 29-404.02(1) (Reissue 1985) provides, among other things, that a peace officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed a felony. We have accordingly held that when a law enforcement officer has knowledge, based on information reasonably trustworthy under the circumstances, which justifies a prudent belief that a suspect has committed a felony, the officer has probable cause to arrest without a warrant. *State v. Wickline, supra*; *State v. Marco*, 230 Neb. 355, 432 N.W.2d 1 (1988). We have also held that when a lawful arrest is made, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. *State v. Marco, supra*, citing *Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969); *State v. Weible*, 211 Neb. 174, 317 N.W.2d 920 (1982).

There was sufficient evidence to support a finding that the police had permission to enter the apartment in which Robinson was found and had probable cause to arrest him without a warrant. Robinson's arrest being lawful, the seizure of money from his person was likewise lawful and therefore properly received in evidence.

### c. Testimony of Informant

Relying on the holdings of the U.S. Supreme Court in *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), and *United States v. Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), Robinson contends that the admission of Koppock's testimony at his trial violated his right to counsel under the sixth amendment to the U.S.

Constitution. This sixth amendment right is not to be confused with the right to be informed of the right to counsel which under certain circumstances arises as an incident of the fifth amendment right against self-incrimination. As said in *State v. Saylor*, 223 Neb. 694, 701-02, 392 N.W.2d 789, 794-95 (1986), *cert. denied* 481 U.S. 1038, 107 S. Ct. 1975, 95 L. Ed. 2d 815 (1987), quoting *Kirby v. Illinois*, 406 U.S. 682, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972): " '[I]t has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the . . . initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' " See, also, *Maine v. Moulton*, 474 U.S. 159, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985); *Brewer v. Williams*, 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977), *reh'g denied* 431 U.S. 925, 97 S. Ct. 2200, 53 L. Ed. 2d 240. The sixth amendment right attaches at that time because

> after the initiation of adversary criminal proceedings, " 'the government has committed itself to prosecute, and . . . the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.' "

*Maine v. Moulton, supra* at 170.

In *Massiah v. United States, supra*, Massiah and another man, one Colson, were indicted for violating narcotics laws and were released on bail. Colson then agreed to cooperate with government agents in their investigation of the activities and allowed a government agent to install a radio transmitter in his automobile. While the agent listened over the radio, Massiah had a lengthy conversation with Colson, during which Massiah made several incriminating statements which were then received in evidence at Massiah's trial.

The U.S. Supreme Court reversed Massiah's conviction on the ground that his sixth amendment right to counsel was violated in that "there was used against [Massiah] at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted

and in the absence of his counsel." *Id*. at 206.

In *United States v. Henry, supra*, the defendant Henry had been indicted for armed robbery and imprisoned. Government agents then contacted Nichols, another inmate at the same facility at which Henry was being housed and who had been engaged for some time as a paid informant for the Federal Bureau of Investigation. After Nichols informed an agent that he shared a cellblock with Henry, the agent told him to be alert to any statements Henry made but not to initiate any conversation with Henry or question him about the robbery. Thereafter, Nichols informed the agent that Henry had made incriminating statements, and Nichols was paid for furnishing the information. Henry's statements to Nichols were then introduced at Henry's trial.

The *Henry* Court determined that under *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964), the question was whether "a Government agent 'deliberately elicited' incriminating statements from Henry . . . ." *United States v. Henry*, 447 U.S. 264, 270, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980). In concluding that the agents had done so, the Court focused on three factors: "First, Nichols was acting under instructions as a paid informant for the Government; second, Nichols was ostensibly no more than a fellow inmate of Henry; and third, Henry was in custody and under indictment at the time he was engaged in conversation by Nichols." *Id*. The Court further noted that the government agent "was aware that Nichols had access to Henry and would be able to engage him in conversations without arousing Henry's suspicion." *Id*. "Even if the agent's statement that he did not intend that Nichols would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." *Id*. at 271. The Court held that "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." *Id*. at 274.

The U.S. Supreme Court next applied the *Massiah* standard in *Maine v. Moulton*, 474 U.S. 159, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985). There, after having been indicted, Moulton had

made incriminating statements in a meeting with his accomplice, Colson, who in cooperation with the police wore a wire transmitter to record the conversation. Although police instructed Colson not to question Moulton but simply to "be himself" in conversation, Colson pretended poor memory of the details of the crimes and "reminisced" about events surrounding the crimes in order to cause Moulton to make several incriminating statements. *Maine v. Moulton, supra* at 165-66.

The State of Maine contended that under *Massiah* and *Henry*, the sixth amendment is violated only when the police set up the conversation with the accused or take some equivalent intentional step, and, thus, because Moulton initiated the meeting, his sixth amendment rights were not violated. The *Moulton* Court answered:

> The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. [Citation omitted.] However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

*Id.* at 176.

Applying the above principle to the facts of *Moulton*, the

Court determined it to be clear that

> the State violated Moulton's Sixth Amendment right when it arranged to record conversations between Moulton and its undercover informant . . . . The police thus knew that Moulton would make statements that he had a constitutional right not to make to their agent prior to consulting with counsel. As in *Henry*, the fact that the police were "fortunate enough to have an undercover informant already in close proximity to the accused" does not excuse their conduct under these circumstances. . . . By concealing the fact that Colson was an agent of the State, the police denied Moulton the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment.

*Maine v. Moulton, supra* at 176-77.

The most recent examination of the issue by the U.S. Supreme Court appears to be found in *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986). Therein, after having been arraigned on charges related to a robbery and murder, the defendant Wilson was placed in a cell with another inmate, Lee, who previously had agreed with police to act as an informant. The police instructed Lee not to ask Wilson any questions, but simply to " 'keep his ears open' " for the names of other perpetrators in the crimes. *Id.* at 439. Lee reported to the police certain incriminating statements that Wilson had made, and such statements were adduced at his trial.

In upholding Wilson's conviction, the Court held:

> Since "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached," [citation omitted], a defendant does not make out a violation of [the sixth amendment right to counsel] simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

*Id*. at 459. Because Lee was instructed only to listen to Wilson for the purpose of identifying the other participants in the crimes and Lee did not ask Wilson any questions but " 'only listened' " to Wilson's " 'spontaneous' " and " 'unsolicited' " statements, the Court held there was no sixth amendment violation. *Id*. at 460.

The *Kuhlmann* Court explained that the sixth amendment violations in *United States v. Henry*, 447 U.S. 264, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980), and *Maine v. Moulton*, 474 U.S. 159, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985), arose because the informants developed relationships of trust and confidence with the defendants and stimulated conversations with the defendants in order to elicit incriminating statements. The actions of the informants in those cases, said the Court, amounted to secret interrogation. Although in *Kuhlmann*, Lee at one point suggested to Wilson that his first version of his participation in the crimes " 'didn't sound too good,' " 477 U.S. at 460, the Court determined that such was not enough to amount to secret and deliberate interrogation.

Finally, the *Kuhlmann* Court emphasized, "As our recent examination of this Sixth Amendment issue in *Moulton* makes clear, the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann, supra* at 459.

To return to the case at hand, the conversations between Robinson and Koppock occurred several months after the initiation of formal charges against Robinson and, thus, after Robinson's sixth amendment right to counsel had attached. Thus, the question resolves itself into whether Koppock's conversations with Robinson were such as to be the equivalent of direct police interrogation.

Robinson in effect argues that because Koppock was an informant paid to find crime wherever it existed, all conversations with him constituted secret and deliberate interrogation by the State. *Kuhlmann*, however, makes clear that such is not the case. That case teaches that in order to show the sixth amendment right to counsel has been violated, an accused must establish more than the mere fact the informant

had a preexisting arrangement with the State. The accused must show that there was interrogation which was deliberately designed to elicit incriminating remarks. The evidence in this case falls far short of establishing that Koppock so interrogated Robinson. The only direct question Koppock posed to Robinson was why Robinson was in prison. Given the setting in which the question was asked, it amounted to nothing more than a greeting. So far as the record reveals, the incriminating statements Robinson later made were volunteered on his part. Even those made after Koppock was equipped with a transmitter by the State Patrol are not shown to have been made as the result of questioning by Koppock. All the record shows is that Koppock initially, and later Koppock and the State Patrol, listened while Robinson volunteered information about the crimes in question. Under that state of the record, it cannot be said the district judge was clearly wrong in concluding that Koppock's testimony was relevant and that there existed no constitutional objection to its admission in evidence.

## 2. Submission of Charges and Sufficiency of Evidence
### a. Procedural Challenge

With respect to the second summarized assignment of error, Robinson first claims the trial judge erred in submitting the use of firearms charge to the jury, because he had previously sustained Robinson's motions to dismiss that charge.

This claim rests on the following exchange, which took place at the close of the State's case:

> [Defense trial counsel]: . . . Comes now the defendant . . . and moves the Court to—for a dismissal of the complaint of robbery for the reason that the State has failed to prove a prima facie case.

> THE COURT: I think I am going to sustain part of that as to [the use of firearms count].

Later, at the close of Robinson's case, the following brief exchange occurred: "THE COURT: Does the Defendant renew his motions? [Defense trial counsel]: Yes, your Honor. THE COURT: Same ruling."

However, the journal entry relating to Robinson's motion at

the close of the State's evidence reads: "Defendant moves for a dismissal as to both counts, motion for dismissal argued and overruled." As to the fate of Robinson's motion at the close of all the evidence, the journal entry reads: "Defendant renews motion of dismissal and same is overruled." We have said that an affirmative showing in the bill of exceptions that a statement in a journal entry contained in the transcript is false overcomes the presumption of truthfulness a journal entry otherwise carries. *State v. Painter*, 223 Neb. 808, 394 N.W.2d 292 (1986). The trial judge's equivocal statement that he thought he would sustain Robinson's motion with respect to the firearms charge and dismiss that charge is not sufficient to overcome the presumption of the truthfulness of the journal entry in this case. The reasonable conclusion to be reached on the record presented is that on further reflection the trial judge changed his mind and ruled other than as he first thought he would.

### b. Substantive Challenge

Robinson further claims, with respect to the second summarized assignment of error, that the trial judge should have directed verdicts in his favor and that the evidence was insufficient to support the jury's verdicts. Our analysis necessarily begins with the rule that on a defendant's motion to dismiss for insufficient evidence of the crime charged, the State is entitled to have all its relevant evidence accepted as true, the benefit of every inference reasonably drawn from the evidence, and every controverted fact resolved in its favor. *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989). Similarly, in determining the sufficiency of the evidence to sustain a criminal conviction, it is not the province of the Supreme Court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence; such matters are for the finder of fact, and the verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Broadstone, ante* p. 595, 447 N.W.2d 30 (1989); *State v. Swigart, ante* p. 517, 446 N.W.2d 216 (1989); *State v. Wokoma, ante* p. 351, 445 N.W.2d 608 (1989).

Section 28-324 provides in part, as it did at all times relevant

to this case, that "[a] person commits robbery if, with intent to steal, he forcibly and by violence, or by putting in fear, takes from the person of another any money or personal property of any value whatever." Section 28-1205(1) provides, as it did at all relevant times, that "[a]ny person who uses a . . . knife . . . to commit any felony which may be prosecuted in a court of this state . . . commits the offense of using firearms to commit a felony." With respect to the robbery and firearms charges, the record discloses that at the close of the State's case, evidence, including the testimony of two eyewitnesses, had been adduced which positively identified Robinson as the individual who had taken cash from convenience store clerk Pfeifer at knife point during the early morning hours of the day in question. Nothing in Robinson's case undermined the State's case, and the district court was correct so to rule in connection with Robinson's various motions to the contrary made at the close of the State's case, at the close of all the evidence, and following conviction.

With respect to the habitual criminal charge, evidence was adduced which establishes that Robinson was sentenced and committed to prison in this state for terms of not less than 1 year on prior separate counseled convictions, to wit, 4 years on a robbery charge and two consecutive 3-year terms on charges of robbery and the use of firearms arising out of another event. Section 29-2221 provides in relevant part, as it did at all times relevant to this case, that "[w]hoever has been twice convicted of crime, sentenced and committed to prison, in this or any other state . . . for terms of not less than one year each, shall, upon conviction of a felony committed in this state, be deemed to be an habitual criminal . . . ." There is thus no question but that the trial judge correctly determined Robinson to be a habitual criminal.

## V. DECISION

Inasmuch as the record fails to sustain any of Robinson's summarized assignments of error, the judgment of the district court is affirmed.

AFFIRMED.

SHANAHAN, J., dissenting.

The majority correctly reiterates the current appellate

standard for review of a suppression hearing, namely, the trial court's findings for a suppression order will be upheld unless "the trial court's findings of fact . . . are clearly wrong." The majority then moves in seven-league boots to the conclusion that "it cannot be said the district judge was clearly wrong in concluding . . . that there existed no constitutional objection" to admission of the questioned testimony from Koppock, the informer.

At the suppression hearing, defense counsel emphasized that Koppock was a "paid agent of the State Patrol," but the district judge surmised that Koppock's status as the State Patrol's paid informant would "go to the credibility and amount of consideration that the Jury [would] give" to Koppock's testimony. Additionally, the district judge remarked and ruled:

> Well, that part of the testimony in which he [Robinson] described the place that he robbed and admits robbing will be received. It's not protected by Miranda at all. It's a voluntary statement made to a private citizen.
>
> . . . .
>
> . . . They are statements made to a private citizen at the time and they are voluntary statements. The Miranda [sic] absolutely does not cover. Those statements will be received.

Inasmuch as *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S. Ct. 2616, 91 L. Ed. 2d 364 (1986), and *Maine v. Moulton,* 474 U.S. 159, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985), had not been decided in 1981 when the suppression hearing occurred in Robinson's case, the colloquy between court and counsel at the suppression hearing clearly dispels any notion of prescience or clairvoyance in the eventual constitutional pronouncements concerning an accused's sixth amendment right to counsel, subsequently expressed in *Kuhlmann* and *Moulton.*

Rather, at the suppression hearing the district judge focused on *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), which dealt "with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 477. Thus, *Miranda*

concerned procedural safeguards to protect the privilege against self-incrimination during custodial interrogation by law enforcement personnel.

In *Sims v. Georgia*, 385 U.S. 538, 87 S. Ct. 639, 17 L. Ed. 2d 593 (1967), which involved voluntariness of a confession, the court addressed specificity in a suppression order and stated: "Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." 385 U.S. at 544.

In a similar vein, the eighth circuit, in *Evans v. United States*, 375 F.2d 355 (8th Cir. 1967), examined a suppression hearing wherein the trial court, having considered voluntariness and the *Miranda* admonition for admissibility of Evans' custodial statements to police, failed to make any express finding that Evans' confession was voluntary or obtained in conformity with *Miranda*. In reversing Evans' conviction based on evidence which included Evans' custodial statements, the eighth circuit held that the district court was required to make a finding on the record with "unmistakable clarity" that the *Miranda* admonition had been administered and that the defendant had voluntarily, knowingly, and intelligently waived the right to counsel in connection with a voluntary confession or statement used as evidence against the defendant. 375 F.2d at 360.

In view of *Sims* and *Evans*, a finding concerning a sixth amendment right in relation to a suppression hearing should also appear in the record with "unmistakable clarity."

All of which brings us to the suppression hearing in Robinson's case. The record substantiates a series of contacts between Koppock and Robinson. In an initial contact and inquiry, Robinson asked Koppock about assistance in obtaining bail, a conversation which was then followed by a later discussion about the gravity of the offense charged against Robinson, namely, armed robbery. After Robinson and Koppock had engaged in still another and subsequent conversation regarding some of the occurrences in the Kwik Shop robbery, the State Patrol "wired" Koppock for a return encounter with Robinson, during which Robinson identified

the location and victim of the robbery. Beyond any doubt, the State Patrol orchestrated and choreographed the scene between Koppock and Robinson. Putting aside the district court's obviously incorrect conclusion that Koppock, a paid informer, was a "private citizen," the district court's finding concerning incriminating information in reference to Robinson's fifth amendment rights (*Miranda*) is distinctly unrelated to Robinson's sixth amendment rights (*Massiah*, *Henry*, *Moulton* and *Kuhlmann*), which supply the premise for the majority's conclusion in Robinson's appeal. The fifth amendment has yet to become the sixth amendment, either in the U.S. Constitution or in the district court's findings for the suppression order under examination.

To conclude that the district court was correct, or at least "not clearly wrong," regarding a determination about Robinson's sixth amendment right is this court's approbatory conclusion regarding correctness in something which never occurred. Consequently, if the sixth amendment is the keystone in the suppression question, as the majority believes, there should be a hearing to determine the sixth amendment issues regarding Robinson's statements. Otherwise, this court has adopted a de novo standard of review for the suppression hearing and has abandoned the standard of "clearly wrong" which has subsisted until Robinson's case.