IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. PORTER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CHAUNCEY R. PORTER, APPELLANT.

Filed February 28, 2017.    No. A-16-669.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Affirmed.

Timothy S. Noerrlinger for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

MOORE, Chief Judge, and INBODY and RIEDMANN, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

This case arises out of a traffic stop of Chauncey R. Porter's vehicle on April 3, 2015, which led to a search of Porter's person and the discovery of nearly 7 grams of methamphetamine. The district court for Lancaster County denied a motion to suppress filed by Porter, and following a stipulated trial, Porter was convicted of possession of methamphetamine with intent to deliver. He was sentenced to 1 to 2 years' imprisonment. On appeal, Porter challenges the denial of his motion to suppress and his sentence. Because the court did not err in denying Porter's motion to suppress or abuse its discretion in sentencing him, we affirm.

## II. BACKGROUND

### 1. INFORMATION

On July 23, 2015, the State filed an information in the district court, charging Porter with one count of possession of methamphetamine with intent to deliver in violation of Neb. Rev. Stat. § 28-416(1) (Cum. Supp. 2014), a Class II felony.

### 2. MOTION TO SUPPRESS AND HEARING

On December 14, 2015, Porter filed a motion to suppress. Porter alleged that on April 3, (1) he was seized by law enforcement, (2) his continued detention by law enforcement was not supported by reasonable suspicion, (3) the search of his person and vehicle was done without a search warrant or exception to the warrant requirement, (4) the search was done without his knowing and voluntary consent, (4) the search was done using coercive and aggressive tactics by law enforcement that overbore his will, and for these reasons, the search violated his constitutional right to be free from unreasonable searches and seizures.

A suppression hearing was held before the district court on February 1, 2016. The State presented testimony from the police officers who conducted the traffic stop and search of Porter's car and his person. Porter testified on his own behalf.

The evidence at the hearing showed that on April 3, 2015, Lincoln police officers Christopher Monico and Anthony Gratz were assigned as investigators with the Lincoln Lancaster County Narcotics Task Force. They were conducting undercover surveillance on an apartment at a particular address in Lincoln after having received information that the people living in the apartment were selling large quantities of methamphetamine. Monico and Gratz had watched the apartment on at least two other occasions within the previous week and had observed "traffic coming in and out of it" on those occasions. At approximately 6 p.m. on April 3, Monico and Gratz saw an individual, later identified as Porter, enter the apartment and then leave about 9 or 11 minutes later. Because short-term visits to private residences are consistent with the sale of narcotics, Monico and Gratz decided to follow Porter's vehicle to see if he could be associated with other persons or places relevant to their investigation.

While following Porter, Monico and Gratz observed him fail to signal several turns and lane changes, and they decided to make a traffic stop. Since they were driving an unmarked car, they called for a marked cruiser to assist them in making the stop. Monico and Gratz continued to follow Porter while they waited for a marked cruiser, which arrived as Porter pulled into the drive-through at a fast food restaurant. After the marked cruiser pulled in behind Porter and activated its overhead lights, Monico and Gratz approached Porter's vehicle to speak with him. Monico approached on the passenger side, while Gratz approached the driver's side, made contact with Porter, and explained that they had stopped him for failure to signal a turn. Because of the limited amount of space in the drive-through and for officer safety reasons, Gratz asked Porter if he would be willing to step out of the vehicle to discuss the traffic violation. During the initial conversation before Porter exited the vehicle, he reached his hand down by the front left pocket of his jeans, acted extremely nervous, and was slow to respond to questions. Porter's hand movement made Gratz think Porter might have something in his pocket that he wanted to remove before

exiting the vehicle. By the time Porter stepped out of his vehicle, two additional officers had arrived in response to the request for a marked cruiser, so there were five police officers present at the scene.

Once Porter stepped out of his vehicle, with Porter's permission, Monico located Porter's insurance and vehicle registration in his glove box. Monico then ran a driver's license check and began writing out a warning citation for the failure to signal violation the officers had observed. While Monico was doing this, Gratz conversed further with Porter. Gratz informed Porter that he and Monico were investigators from the narcotics unit, at which point Porter's nervousness increased. His shaking and twitching became more noticeable, and he stared at the ground. Gratz inquired about methamphetamine use and addiction, and Porter admitted he did use methamphetamine. Gratz asked Porter if he had anything illegal on him or in his vehicle at that time, which Porter denied. Gratz asked Porter if he would mind showing that there was nothing in his pockets, at which point Porter emptied his pockets. Porter agreed to Gratz's request to conduct a pat-down of Porter's pockets to make sure nothing had been left in them. No illegal items were discovered in Porter's pockets during this process.

While Monico was working on the citation paperwork, Gratz conversed further with Porter about his level of nervousness. Despite the "60-degree or plus weather," Porter informed Gratz the he was simply cold and asked Gratz to retrieve a sweatshirt from Porter's vehicle, which Gratz did. Porter removed his hat to put on the sweatshirt, appeared to remove something from his hat as he did so, and then appeared to be doing something with his hands near his waist or groin area. Gratz testified that Porter made a motion with his hand as though he had removed an item from his hat and then immediately plunged his hands into the front pocket of his sweatshirt. Monico testified that he observed Porter pull the front of the sweatshirt "way down past the front of his waistline." Both Monico and Porter became concerned that Porter might have been hiding illegal drugs or a weapon. Porter agreed to let Gratz look in his hat, and Gratz found nothing inside. The officers then asked Porter if he had anything illegal on his person or in his car. According to Monico, Porter's response to the inquiry about whether he had anything illegal on his person or in his car was "go ahead and look." Because Porter's response surprised him, Monico asked, "so you're saying it's okay to search the car and you." Porter again said "go ahead and look" and lifted up his arms. According to Gratz, Porter initially denied a request to search his vehicle, but then without further questioning, he said something to the effect of "Go ahead, there's nothing in my vehicle."

Gratz searched Porter's vehicle and found nothing illegal. While Gratz searched the vehicle, Monico searched Porter. Monico began by patting down Porter for any bumps or bulges or anything that felt odd or suspicious. Monico testified that he then checked Porter's midsection again because that is a place where people normally hide weapons and narcotics. Monico checked the flap covering the zipper of Porter's pants by grabbing it with his left thumb and index finger and pulling it back, at which point Porter said, "Quit touching my dick." Monico informed Porter, "I'm not touching your dick, I'm touching the flap of your jeans," and Porter repeated his previous statement. Monico proceeded to check around the waistband of Porter's jeans and noticed that Porter's belt was extremely tight. Monico asked Porter to undo his belt, which Porter did. This loosened Porter's pants so that Monico was able to pull the waistband away from Porter's body

and see that Porter was wearing both gym shorts and boxer shorts underneath his pants. Monico could also see the tail end of a plastic baggie sticking straight up from Porter's groin area. The baggie appeared to be lodged between Porter's gym shorts and boxers, but Monico was not sure how Porter had "positioned it down there."

Monico pulled out the plastic baggie, which contained what appeared to be methamphetamine. A field test of the substance was positive for the presence of amphetamine/methamphetamines. Porter was then arrested for possession of methamphetamine, and issued a citation for the traffic violation.

Monico and Gratz testified that only about 5 to 10 minutes elapsed from the time of their first contact with Porter in his vehicle in the drive-through until he was arrested. They testified that Porter voluntarily consented to the search, that no threats or promises were made, and that Porter never asked for the search to stop or indicated that he was no longer willing to be searched. There was no testimony from either Monico or Gratz that they ever touched, saw, or exposed Porter's genitals.

Porter also testified at the suppression hearing, and he provided a much different account of what happened. He testified that Monico and Gratz ordered him out of his car at gunpoint and "were like, oh, why were you driving so crazy, da, da, da, da, da," and then they "tried to put [him] in a spot where nobody could see [him]." Porter testified that the officers took his cell phone, and that after retrieving his registration and insurance, the officers told him they were "searching [him] for drugs" because he "left a known area" and were telling him to empty his pockets. According to Porter, all five police officers surrounded him, talking to him all at once and trying to distract him. Porter testified that he was patted down and told to empty his pockets, and that after he emptied his pockets, the officers "got visibly mad" and told him to remove his boots and socks. According to Porter, he stood barefoot in the parking lot for 20 minutes. He stated that the officers all passed around his boots and socks and that when he began to get cold, the officers started laughing at him, calling him "a pussy and whatnot," and telling him he should not be cold. Porter testified that he had to wait until after he was "completely searched" to get a hoodie.

Porter testified that during the search, the officers had him take his belt off and "started jiggling [his] pants and whatnot." According to Porter, an officer then started rubbing Porter's penis and looking at Porter with "a dirty little smirk." Porter responded by saying, "Quit touching my dick," after which, the officer pushed Porter onto the car and "just [went] to town." Porter claimed that the officer conducting the search proceeded to pull down Porter's boxers, exposing his genitalia to "the drive-thr[o]u[gh] and the people that live right behind there." Porter claimed that the officer "was digging inside [Porter's] underwear" and had to "put his hands all the way back to [Porter's] butt hole" to find the methamphetamine. Porter also claimed that the officers "cheered like they hit the lottery" when the methamphetamine was located. According to Porter, the whole incident took about 45 minutes and he never consented to a pat-down or any type of search. He agreed at the hearing that he is a methamphetamine user but denied having told the officers this on the day of the traffic stop and search.

The district court took the matter under advisement and after receiving briefs from the parties and hearing further argument on February 4, 2016, orally denied Porter's motion to suppress. Specifically, the court found that the officers had probable cause to conduct a traffic stop

of Porter's vehicle after observing his traffic violations. The court also found nothing improper with requesting that Porter exit his vehicle so they could speak with him further during the traffic stop. The court found that the pat-down and search of Porter was lawful, because Porter verbally consented and also conveyed his consent by lifting his arms. Finally, the court determined that there was not an unreasonable lapse of time before the officers requested Porter's consent to search, that the consent given was not limited to a pat-down only, and that the search did not exceed the scope of the consent given. The court determined that because of Porter's consent, there was no need for probable cause to believe that Porter had drugs on his person, and also determined that the area searched was not unreasonable in light of Porter's furtive gestures.

### 3. TRIAL, CONVICTION, AND SENTENCING

A stipulated bench trial took place on April 15, 2016. The State offered four exhibits, consisting of the bill of exceptions from the suppression hearing; a police report regarding the incident; a Nebraska State Patrol Crime Lab report confirming that the substance seized from Porter tested positive for methamphetamine; and a written trial stipulation. The evidence showed that the substance recovered from Porter tested positive for methamphetamine and weighed 6.9877 grams. The State's evidence was received without objection, other than Porter's renewal of his motion to suppress, which was again denied by the district court.

The district court found Porter guilty of possession of methamphetamine with intent to deliver and following a subsequent sentencing hearing, sentenced Porter to 1 to 2 years' imprisonment.

## III. ASSIGNMENTS OF ERROR

Porter asserts that the district court erred by (1) overruling his motion to suppress and (2) imposing an excessive sentence.

## IV. STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Arizola*, 295 Neb. 477, ___ N.W.2d ___ (2017). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Castaneda*, 295 Neb. 547, ___ N.W.2d ___ (2017). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. MOTION TO SUPPRESS

Porter asserts that the district court erred by overruling his motion to suppress. He does not dispute the validity of the traffic stop, but he argues that his motion to suppress should have been granted because the subsequent detention and search of his person were unlawful. Porter argues that (1) after employing precursory investigative techniques allowable in traffic stops, law enforcement continued to detain him without reasonable suspicion; (2) he did not consent to the search of his person, which was conducted without a warrant or any warrantless search exception; and (3) even if he consented to the search of his person, that search was unlawful because it exceeded the scope of the consent given and because he withdrew his consent. We address each of these arguments in turn.

### (a) Duration of Detention

A traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle. *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011). Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. *Id.* This investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel. *Id.* Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether there are any outstanding warrants for any of its occupants. *Id.*

Additionally, the U.S. Supreme Court has determined that an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop" as long as these check are not conducted "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, ___ U.S. ___, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015). The U.S. Supreme Court has stated:

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. . . . An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

*Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 788, 172 L. Ed. 2d 694 (2009). See, also, *Muehler v. Mena*, 544 U.S. 93, 101, 125 S. Ct. 1465, 161 L. Ed. 2d 299 (2005) (because unrelated inquiries did not extend petitioner's detention, no additional Fourth Amendment justification was required).

In this case, it was reasonable for the officers to ask Porter about drugs during the traffic stop, given that they had just seen him leave an apartment associated with suspected drug activity after a short visit, which the officers testified can be indicative of a drug-related transaction. Upon

contact with the officers, Porter became extremely nervous, started shaking, and was slow to answer questions. Finally, given that the entire encounter from first contact to discovery of the drugs lasted only 5 to 10 minutes, the unrelated questioning did not measurably extend the duration of the stop.

Even if the officers' questioning of Porter on matters unrelated to the traffic stop amounted to an expansion of the stop, the officers had an independent justification for such an expansion. To expand the scope of a traffic stop and continue to detain the motorist, an officer must have reasonable, articulable suspicion that a person in the vehicle is involved in criminal activity beyond that which initially justified the interference. See *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011).

Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. *State v. Nelson, supra*. Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances. *Id.* Reasonable suspicion exists on a case-by-case basis. *Id.* Factors that would independently be consistent with innocent activities may nonetheless amount to reasonable suspicion when considered collectively. *Id*.

In this case, as discussed above, the officers were investigating an apartment where the occupants were suspected of dealing methamphetamine. They observed Porter make a brief visit to this apartment and followed his vehicle when he left to see if he would lead them to other locations or persons relevant to their investigation. After observing several traffic violations, the officers, who were driving an unmarked car, called for a marked police car to make a traffic stop of Porter's vehicle. Upon making contact, the officers observed Porter to be visibly nervous and slow to answer questions. Once they explained that they were narcotics officers, Porter's nervousness increased and he was very visibly shaking. Porter attributed this shaking to being cold, despite the mild weather conditions, and asked the officers to retrieve a sweatshirt from his vehicle. When Porter removed his hat to put on the sweatshirt, he appeared to remove something from his hat as he did so, and he made furtive movements with his hand near his waist or groin area. When these factors are considered collectively, the officers had a reasonable suspicion to expand the scope of the traffic stop and continue to detain Porter.

### (b) Consent to Search

Porter argues that he did not voluntarily consent to the search of his person conducted by Monico and that this search was conducted without a warrant or any warrantless search exception.

Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, but a search undertaken with consent is a recognized exception. *State v. Milos*, 294 Neb. 375, 882 N.W.2d 696 (2016). In order for a consent to search to be effective, it must be a free and unconstrained choice and not the product of a will overborne. *Id.* Consent to a search must be given voluntarily and not as the result of duress or coercion, whether express, implied, physical, or psychological. *State v. Tyler*, 291 Neb. 920, 870 N.W.2d 119 (2015), cert. denied, ___ U.S. ___, 136 S. Ct. 1207, 194 L. Ed. 2d 212 (2016). Whether consent to search was voluntary is to be

determined from the totality of the circumstances surrounding the giving of consent. *State v. Milos, supra*.

In this case, Porter agreed to an initial pat-down of his pockets by Gratz when he got out of his vehicle. He was subsequently patted down and searched by Monico after Monico observed Porter's furtive hand movements in removing his hat and again near his waist or groin area. Monico asked Porter to be honest about whether he had anything illegal in his car or on his person, and Porter told him to go ahead and look. This answer surprised Monico, so he inquired whether Porter was saying that it was okay to search his car and his person. Porter again told Monico to go ahead and look and raised his arms, after which Monico conducted a search of Porter's person. Monico and Gratz testified that Porter voluntarily consented to the searches they conducted, that no threats or promises made, that Porter never asked for the search to end or indicated that he was no longer willing to be searched. Under the circumstances of this case, the district court did not err in concluding that Porter consented to the search by Monico.

Porter also challenges the search as unlawful in light of the prolonged detention and notes that he was not advised of his right to refuse to consent to a search of his person. We have already determined that the officers' questioning did not unreasonably prolong Porter's detention. Also, an officer need not give any warning to a citizen that he or she may freely refuse a request to search. *State v. Dallmann*, 260 Neb. 937, 621 N.W.2d 86 (2000). These arguments are without merit.

(c) Scope of Search

Finally, Porter argues that even if he consented to the search of his person, that search was unlawful because the search of his groin area exceeded the scope of the consent given and because he withdrew his consent.

A search made pursuant to consent may not exceed the scope of the consent. *State v. Sutton*, 231 Neb. 30, 434 N.W.2d 689 (1989). The permissible scope of a search is not to be determined on the basis of the subjective intentions of the consenting party or the subjective interpretation of the searching officer. *State v. Howell*, 284 Neb. 559, 822 N.W.2d 391 (2012). The standard for measuring the scope of a suspect's consent to search under the Fourth Amendment is that of objective reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect? *State v. Milos*, 294 Neb. 375, 882 N.W.2d 696 (2016).

In this case, the officers conducted a traffic stop of Porter and explained that he had failed to signal a turn. They also informed him they were narcotics investigators and asked him about drug use. Porter initially denied having any drugs in his vehicle or on his person. However, when Monico observed Porter's increasing nervousness and furtive hand motions after Porter asked the officers to retrieve a sweatshirt from his vehicle, Monico asked Porter to be honest about whether he had drugs on his person or in his vehicle. Porter told Monico to go ahead and look, repeating this statement and raising his arms when Monico sought clarification. Prior to this exchange, Gratz had already conducted a pat-down search of Porter's pockets. A typical reasonable person would have understood by this exchange between Monico and Porter that Porter was consenting to a

search of his person by Monico. There is nothing in the record to indicate that Porter limited his consent to a pat-down search only.

Porter argues, however, that when he twice told Monico, "Quit touching my dick," he was withdrawing his consent to be searched or limiting the scope of the search. Once given, consent to search may be withdrawn. *State v. Milos, supra*. Withdrawal of consent to search need not be communicated by "magic words," but an intent to withdraw consent must be made by unequivocal act or statement. *Id.* Conduct withdrawing consent must be an act clearly inconsistent with the apparent consent to search, an unambiguous statement challenging the officer's authority to conduct the search, or some combination of both. *Id.*

While a consent to search is not terminated merely by a worsening of the consenting party's position, a consent may be withdrawn or limited at any time prior to the completion of the search. *State v. French*, 203 Neb. 435, 279 N.W.2d 116 (1979). A consensual search is circumscribed by the extent of the permission given, as determined by the totality of the circumstances. *State v. Smith*, 279 Neb. 918, 920, 782 N.W.2d 913, 919 (2010).

Porter's statement, "Quit touching my dick," was not an unequivocal withdrawal of his consent to the search. He did not ask Monico to stop searching him; he did not challenge Monico's authority to search him. He merely asked Monico not to touch his genitals. Monico both showed and explained to Porter that he was not doing so, and there is no indication in the record that Monico actually touched Porter's genitals during the search. Monico testified that suspects often hide drugs inside the zipper flap of their pants, and his examination of this area during the consensual search was not unreasonable. Porter did not withdraw his consent for the search and the only limit placed on his consent was that Monico not touch his genitals.

Following this exchange, Monico proceeded to examine the waistband of Porter's pants and discovered that Porter's belt was unusually tight. When asked to remove his belt, Porter did so and gave no indication, verbally or physically, that he was no longer willing to be searched. See *State v. Modlin*, 291 Neb. 660, 867 N.W.2d 609 (2015) (consent to search may be implied by action rather than words). Upon removal of Porter's belt, Monico pulled the waistband of Porter's pants away from his body and was able to see that Porter had on both gym shorts and boxer shorts under his pants. He could also see the tail end of a baggie sticking up from between the gym shorts and boxers. The officers had informed Porter that they were looking for drugs. Monico testified that a person's midsection is a normal hiding place for narcotics. Under the circumstances of this case, Monico did not exceed the scope of Porter's consent by carefully and discreetly looking inside his waistband. See *United States v. Russell*, 664 F.3d 1279 (9th Cir. 2012) (officer's pat-down of defendant's groin reasonable where defendant who knew officer was looking for drugs verbally consented twice to search, lifted arms and spread legs to facilitate search, and did not object to search that started at defendant's ankles and proceeded upward); *Hudson v. Hall*, 231 F.3d 1289 (11th Cir. 2000) (brief and discreet look into pants of suspect by officer of same sex during search for drugs and weapons did not exceed scope of general consent to search for drugs); *Kidd v. Commonwealth*, 38 Va. App. 433, 565 S.E.2d 337 (2002) (suspect's general consent to search of body permitted officer to pull away suspect's underwear and look inside). In this case, the search of Porter's waistband and the brief discreet look inside his pants did not exceed the scope of his consent. Porter's arguments to the contrary are without merit.

(d) Conclusion

The district court did not err in denying Porter's motion to suppress. Porter's first assignment of error is without merit.

2. EXCESSIVE SENTENCE

Porter asserts that the district court erred by imposing an excessive sentence. Porter was convicted of possession of methamphetamine with intent to deliver, a Class II felony with a maximum prison sentence of 50 years and a minimum of 1 year. § 28-416; Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014). Accordingly, the court's sentence of imprisonment for 1 to 2 years was well within statutory limits.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Garza*, 295 Neb. 434, 888 N.W.2d 526 (2016). When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the violence involved in the commission of the crime. *State v. Cerritos-Valdez*, 295 Neb. 563, ___ N.W.2d ___ (2017). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Porter argues that the court should have imposed a sentence of probation. Whether probation or incarceration is ordered is a choice within the discretion of the trial court, whose judgment denying probation will be upheld in the absence of an abuse of discretion. *State v. Cerritos-Valdez, supra*. When deciding if it is appropriate to withhold a sentence of imprisonment and grant probation, a sentencing court is guided by the statutory grounds set forth in Neb. Rev. Stat. § 29-2260 (Reissue 2008). *State v. Cerritos-Valdez, supra*.

At the sentencing hearing, Porter's counsel asked that Porter be placed on probation rather than incarcerated. In sentencing Porter, the district court stated that it had considered comments by Porter and his attorney and the information in the presentence investigation report (PSR) but it found probation inappropriate given the serious nature of Porter's offense. The court also noted Porter's long-term methamphetamine abuse and lack of treatment, as well as the likelihood that he would reoffend if placed on probation. The court sentenced Porter to incarceration for a period of 1 to 2 years.

At the time of the PSR, Porter was 31 years old. He had a high school education, was employed, and was living in Florida. Much of his criminal history consists of traffic offenses, but he has a total of five drug-related offenses. His first drug offense occurred in 2003 when he was cited and fined for possession of marijuana. He has never been placed on probation. On the Level of Service/Case Management Inventory, he scored in the medium high risk to reoffend.

The district court did not abuse its discretion in imposing a sentence of incarceration rather than probation or in the sentence imposed, which is not excessive. This assignment of error is without merit.

## VI. CONCLUSION

The district court did not err in denying Porter's motion to suppress. Nor did it abuse is discretion in sentencing Porter.

AFFIRMED.